UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

E.B. ex rel. M.B. and R.B., *et al.*,

        Plaintiffs,

    v.

ANDREW CUOMO, *in his official capacity
as Governor of the State of New York*,
and DR. THEODORE KASTNER, *in his
official capacity as Acting Commissioner,
New York State Office for People with
Developmental Disabilities*,

        Defendants.
_____

16-CV-735
DECISION & ORDER

On September 13, 2016, the plaintiffs, five individuals with developmental

disabilities and their caregivers, filed a complaint under Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and Section 504 of the

Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.  Docket Item 1.  They

alleged that the defendants, Andrew Cuomo, Governor of New York State, and Dr.

Theodore Kastner, Commissioner of the New York State Office for People with

Developmental Disabilities ("OPWDD")[1] (collectively, "the state"), unlawfully had denied

them access to OPWDD-funded programs that provide supported and community-

_____

[1] Under Rule 25(d) of the Federal Rules of Civil Procedure, "when a public officer
who is a party in an official capacity . . . ceases to hold office while the action is
pending[, t]he officer's successor is automatically substituted as a party. . . . The court
may order substitution at any time, but the absence of such an order does not affect the
substitution."  The Clerk of Court shall replace Kerry Delaney, the former acting
Commissioner of OPWDD, with Dr. Theodore Kastner, the current Commissioner of
OPWDD.

based residential placements.  *Id.*  The plaintiffs also moved that same day to certify two classes.  Docket Item 3.

On December 8, 2016, the defendants moved to dismiss the complaint.  Docket Item 17.  The plaintiffs replied on January 17, 2017, opposing dismissal and, in the alternative, moving for leave to replead.  Docket Item 21.  The defendants replied on January 31, 2017.  Docket Item 23.[2]

For the reasons that follow, this Court grants the defendants' motion without prejudice with respect to the plaintiffs' first, second, fifth, and sixth claims; and with prejudice with respect to the plaintiffs' third and fourth claims.

## **BACKGROUND**

The plaintiffs in this matter are comprised of two discrete groups.  The "Residents" are "adults with developmental disabilities who qualify for services from the [OPWDD]; who are not capable, by virtue of their developmental disabilities, to live in the community without assistance and support, but who are capable of living in the community with assistance and support[;] who are presently living . . . with family and/or related caregiver(s); [and] who would prefer to live in the community in a supported

---

[2] On December 19, 2016, this Court referred the matter to United States Magistrate Judge H. Kenneth Schroeder, Jr., for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B).  Docket Item 18.  Because Judge Schroeder had yet to act on the instant motions, this Court withdrew that reference on May 18, 2020.  *See* Docket Item 29 (citing 28 U.S.C. § 636(c)(4) ("The court may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a [dispositive] reference of a civil matter to a magistrate judge under [section 636(c)]."); *Cooley v. Foti*, 1988 WL 10166, at *2 (E.D. La. Feb. 5, 1988) ("The withdrawal of a reference made to the magistrate *without* the consent of the parties pursuant to [section] 636(b), of course, requires no greater showing than the withdrawal of a reference made pursuant to [section] 636(c).")).

residential setting but cannot because there are insufficient available appropriate residential settings."  Docket Item 1 at 4.  And the "Caregivers" are "the parents and/or related caregivers who provide housing, care and services to [the Residents]," even though they "are not legally obligated to do so . . . [and] would prefer that [the Residents] live in the community in a supported residential setting."  *Id.* at 4-5.

At issue is the state's alleged policy of providing supported, community-based residential placements only to those individuals with disabilities who are in "an acute emergency or crisis," such as being at "imminent risk of harm to themselves or others" or "in imminent danger of homelessness."  *Id.* at 11.  This prioritization policy results from the state's provision of fewer than 1,500 such placements each fiscal year, falling far short of the slots needed to meet the demands of the 11,000 "eligible" individuals on the program's waiting list.  *Id.*  Because the Caregivers are able and willing to provide housing and care to the Residents, the Residents have not received one of these placements.  *Id.*

## DISCUSSION

### I.    LEGAL STANDARD

To decide a motion to dismiss for failure to state a claim upon which relief may be granted, courts "ask whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "The court accepts as true all well-pleaded factual allegations in the complaint [and] draws all reasonable inferences in favor of the nonmoving party."  *Id.* (citation omitted).  "Dismissal is inappropriate unless it appears beyond doubt

that the plaintiff can prove no set of facts which would entitle him or her to relief."
*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).  But
courts "are not bound to accept as true a legal conclusion couched as a factual
allegation," nor will "a formulaic recitation of the elements of a cause of action" suffice.
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

## II.    THE ADA AND SECTION 504

"The ADA was enacted to 'provide a clear and comprehensive national mandate
for the elimination of discrimination against individuals with disabilities.'"  *Henrietta D. v.
Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (quoting 42 U.S.C. § 12101(b)(1) (2000)).
"Both Title II of the ADA and [Section 504] protect the rights of disabled individuals to
participate in state-administered or funded services."  *Davis v. Shah*, 821 F.3d 231, 259
(2d Cir. 2016).  Under Title II, "no qualified individual with a disability shall, by reason of
such disability, be excluded from participation in or be denied the benefits of the
services, programs, or activities of a public entity, or be subjected to discrimination by
any such entity."  42 U.S.C. § 12132.  And under Section 504, "[n]o otherwise qualified
individual with a disability . . . shall, solely by reason of her or his disability, be excluded
from the participation in, be denied the benefits of, or be subjected to discrimination
under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. §
794(a).  A "qualified individual with a disability" is defined as "an individual with a
disability who . . . meets the essential eligibility requirements for the receipt of services
or the participation in programs or activities provided by a public entity."  42 U.S.C. §
12131(2).

4

"Title II's enforcement provision extends relief to 'any person alleging discrimination on the basis of disability.'" *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (alteration omitted) (quoting 42 U.S.C. § 12133), *recognized as superseded on other grounds, Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001). "Similarly, [Section 504] extends its remedies to 'any person aggrieved' by the discrimination of a person on the basis of his or her disability." *Id.* (quoting 29 U.S.C. § 794a(a)(2)). Because these "enforcement provisions . . . 'evince[ ] a congressional intention to define standing to bring a private action under [section] 504 [and Title II] as broadly as is permitted by Article III of the Constitution,'" both a qualified individual with a disability and an individual subject to discrimination based on her "association with [such] persons" may bring a claim under either statute. *See id.* (citation omitted) (third alteration in original); *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 280-82 (2d Cir. 2009) (same).

"[Courts] 'treat claims under the two statutes identically' in most cases." *Davis*, 821 F.3d at 259 (quoting *Henrietta D.*, 331 F.3d at 272). "To state a prima facie claim under either provision, a plaintiff must establish '(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability.'" *Id.* (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)). "Additionally, to establish a violation [of Section 504], a plaintiff must show that the defendants receive federal funding." *Henrietta D.*, 331 F.3d at 272 (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)).

The parties do not dispute that the plaintiffs adequately have alleged the first, second, and fourth elements.  The parties do, however, dispute whether the plaintiffs have met their burden with respect to the third element—that is, whether the complaint plausibly alleges that the state has excluded the Residents from access to supported, community-based residential placements because of, or on the basis of, their disabilities.  The Court first addresses the Residents' theories of discrimination and then turns to the Caregivers'.

## III.   RESIDENTS' CLAIMS

To establish discrimination on the basis of disability, a plaintiff may rely on "one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation."  *Davis*, 821 F.3d at 260.  This Court understands the Residents to advance the first theory of liability in two distinct ways.[3]  They first allege, in counts one and two, that the state has violated the ADA's and Section 504's community-integration mandates, as articulated by the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).  And they also allege, in counts three and four, that the state unlawfully has treated them differently than others who are similarly situated.

### A.   Counts One and Two: Community-Integration Mandate

The Residents' first theory is that the state, in denying them access to OPWDD's supported, community-based residential placements, has violated the ADA's and

---

[3] *Cf. Davis*, 821 F.3d at 260 n.18 (treating the plaintiffs' *Olmstead* claim, brought under both disparate-treatment and reasonable-accommodation theories, as "primarily pressing" a disparate-treatment claim).

Section 504's community-integration mandate.  *See* Docket Item 1 at 12-16.  The state disagrees, arguing that the integration mandate applies only when an individual with a disability unjustifiably is at imminent risk of institutionalization, a situation the Residents do not allege that they face.  *See* Docket Item 17-1 at 16-18.

The Court agrees with the state that the Residents have not plausibly alleged that they are at imminent risk of institutionalization.  But the Court disagrees that home placement never can violate the community-integration mandate.  Nevertheless, because that theory is insufficiently pleaded, the Court dismisses the Residents' integration claims with leave to replead.

### 1.   *Olmstead* and the Integration Mandate

In *Olmstead*, the Supreme Court held that if states provide treatment to individuals with disabilities, they must, within financial reason, do so in the most community-integrated setting appropriate to each individual's needs.  527 U.S. at 607.  In that case, two individuals with mental disabilities challenged Georgia's refusal to transition them from psychiatric hospitals into community-based living arrangements.  *Id.* at 593.  Justice Ginsburg, writing for the majority, framed the issue as "whether the proscription of discrimination [in Title II of the ADA] may require placement of persons with mental disabilities in community settings rather than in institutions" and held that the answer was "a qualified yes."  *Id.* at 587.  The Court based its holding on "two key determinations" apparent from the Department of Justice's implementing regulations: the integration mandate and the fundamental-alteration defense.  *Id.* at 597-98; *see also id.* at 598 (observing that the Department of Justice's views "warrant[ed] respect").

The integration mandate provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  *Id.* at 592 (quoting 28 CFR § 35.130(d)).  "'[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities' . . . mean[s] 'a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'"  *Id.* (quoting 28 CFR pt. 35, App. A, p. 450).  This regulation, the Court explained, demonstrated that "[u]njustified isolation . . . is properly regarded as discrimination based on disability."  *Id.* at 597.

In this regard, the fact that the plaintiffs "had identified no comparison class, *i.e.*, no similarly situated individuals given preferential treatment," was of no moment.  *Id.* at 598.  "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA."  *Id.*  For instance, it had "explicitly identified unjustified 'segregation' of persons with disabilities as a 'fo[rm] of discrimination.'"  *Id.* at 600 (alteration in original) (quoting 42 U.S.C. § 12101(a)(2) ("[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.")) (citing 42 U.S.C. § 12101(a)(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . . segregation.")).  These findings expanded the sorts of conduct cognizable under the ADA because they demonstrated Congress's belief (1) that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and (2) that "confinement in an institution severely

diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.  Stated differently, unjustified isolation constituted discrimination *per se*.

The fundamental-alteration defense tempers—in Justice Ginsburg's words, "qualif[ies]"—the integration mandate.  It requires that "[a] public entity . . . make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Id.* at 592 (quoting 28 CFR § 35.130(b)(7)).  From this regulation, it was apparent that states could "resist modifications that 'would fundamentally alter the nature of the service, program, or activity.'"  *Id.* at 597 (quoting 28 CFR § 35.130(b)(7)).

Writing for a plurality of the Court, Justice Ginsburg explained that "the fundamental-alteration component of the reasonable-modifications regulation [allows a state] to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the [s]tate has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Id.* at 604.  "If, for example, the [s]tate were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the [s]tate's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met."  *Id.* at 605-06.  Stated differently, courts "have no

warrant effectively to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions." *Id.* at 606; *see also id.* at 607 (Stevens, *J.*, concurring in judgment) ("If a plaintiff requests relief that requires modification of a State's services or programs, the [s]tate may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a [s]tate's services and programs.").

In light of these principles, the Court summarized states' obligations as follows: A state must "provide community-based treatment for persons with mental disabilities" when (1) "the [s]tate's treatment professionals determine that such placement is appropriate"; (2) "the affected persons do not oppose such treatment"; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the [s]tate and the needs of others with mental disabilities." *Id.* at 607.  But the Court explicitly rejected the notion that "the ADA imposes on the [s]tates 'a standard of care' for whatever medical services they render[ ] or . . . requires [s]tates to 'provide a certain level of benefits to individuals with disabilities.'" *Id.* at 603 n.14.  Instead, "[s]tates must adhere to the ADA's nondiscrimination requirement with regard to the services *they in fact provide*." *Id.* (emphasis added).

The Residents claim that the state has violated the integration mandate in either of two ways: (a) placing them at risk of institutionalization or (b) unjustifiably segregating them from the community.  *See* Docket Item 1 at 12-16.  The Court considers the viability of each theory in turn.

### 2.     The Residents' Theories of *Olmstead* Liability

#### a.     *Risk of Institutionalization*

The Residents first argue that the state's method for prioritizing its supported, community-based residential placements violates the integration mandate because it places them at unacceptable risk of institutionalization.  *See* Docket Item 1 at 11.  The state counters that such an assertion is too speculative to confer standing.  The Court agrees with the state.

"To establish Article III standing, . . . a plaintiff must show "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 157-58 (2014)).  "[The] injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 149 (2010)).  "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List,* 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 409, 414 n.5).  But "'allegations of *possible* future injury' are not sufficient."  *Clapper*, 568 U.S. at 398 (emphasis added) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

In *Davis*, the Second Circuit found that a New York statute limiting Medicaid coverage of orthopedic footwear and compression stockings to a narrow set of medical conditions—a decision that the state conceded would "severely exacerbate [the plaintiffs'] ailments, putting them at a substantial risk of requiring institutionalized

care"—constituted "discrimination due to disability so as to violate the ADA and Rehabilitation Act."  821 F.3d at 260, 264.  Reading *Olmstead* "broad[ly]," the court found that a state may violate the ADA and Section 504 when it denies individuals with disabilities a service or support necessary for those individuals to avoid a "serious" or "substantial risk of institutionalization."  *Id.* at 260, 263, 264.  In support of this conclusion, the court cited a Department of Justice statement that a plaintiff

> need not wait until the harm of institutionalization or segregation occurs or is imminent' in order to bring a claim under the ADA.  Rather, a plaintiff establishes a 'sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.

*Id.* at 262-63 (emphasis in original) (quoting U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* ["DOJ *Olmstead* Guidance"], (last updated June 22, 2011), www.ada.gov/olmstead/q&a_olmstead.htm).

The relevant question therefore is not whether the plaintiffs might someday face institutionalization; rather, it is whether the plaintiffs can demonstrate that the state's prioritization policy "will *likely* cause a decline in health, safety, or welfare that would lead to [their] eventual placement in an institution."  *Id.* at 263 (citation omitted); *see also Forziano v. Indep. Grp. Home Living Program, Inc.*, 613 Fed. App'x 15, 17 (2d Cir. 2015) (summary order) (finding that the plaintiffs lacked standing and dismissing their complaint because "[a]lthough [they] posit[ed] that they may be forced to move out of [their preferred living situation] at some point, such speculative harm [was] insufficient to confer standing").

Here, the plaintiffs allege that "[o]ver 11,000 persons with developmental disabilities statewide . . . have requested and are awaiting placement in an appropriate supported community residential setting."  Docket Item 1 at 11.  More than sixty percent of those individuals currently reside with caregivers "who themselves are experiencing health or other issues impacting their ability to provide care," and almost fifty percent reside with caregivers "over the age of 60."  *Id.*  Because "[fewer] than 1,500 supported community residential placements statewide will become available . . . in [the upcoming] fiscal year," they will be used primarily to meet the needs of "eligible individuals who are in acute emergency situations, such as being at imminent risk of harm to themselves or others or who are in imminent danger of homelessness."  *Id.*  As such, "[s]upported community residential settings . . . will not be [ ] available for other individuals" who, like the plaintiffs, do not face emergency situations.  *Id.*  "In other words," the Residents explain in their opposition to the state's motion to dismiss, "Resident[s] must wait until their own circumstances have devolved to the point where [they are] at imminent risk of hurting [themselves] or others, or in danger of homelessness," at which point they "will likely have to be institutionalized due to [the state's] failure to appropriately plan for the expected transition."  Docket Item 21 at 23.

The Residents' allegations are too tenuous to establish standing.  They allege, in effect, that their caregivers may become unable to provide care; that they then may not receive one of the 1,500 available supported, community-based residential placements (placements they elsewhere concede are specifically reserved for such situations); and that their health and welfare then may deteriorate to such a level that they require

institutional care.  This hypothetical chain of events falls short of demonstrating a "certainly impending" risk of injury.

In short, the plaintiffs have not plausibly alleged that the state's failure to immediately provide them with supported, community-based residential placements *now* "will *likely*" result in their institutionalization in the future.  *See Davis*, 821 F.3d at 263. The Court therefore turns to their alternative *Olmstead* theory—that home placement itself constitutes "unjustified isolation."

### b.    Unjustified Isolation

The Residents offer the alternative, and novel, argument that their current living situation in their relatives' homes constitutes unjustified isolation.  *See* Docket Item 1 at 13-16.  The state responds that an *Olmstead* claim requires, at a minimum, a substantial risk of institutionalization and cannot otherwise be premised on a claim of intra-class discrimination.  *See* Docket Item 17-1 at 16, 20. This Court agrees with the Residents in the abstract but finds that their complaint, as pleaded, does not allege facts sufficient to support this theory.  It therefore dismisses counts one and two with leave to replead.

### i.    Unjustified Isolation Is Broader than Unjustified Institutionalization

The integration mandate plainly applies when individuals with disabilities needlessly are placed in institutional settings.  But does it apply when those same individuals needlessly are placed in non-institutional, but nevertheless more-restrictive-than-necessary, settings?  Neither the Supreme Court nor the Second Circuit has answered this question, but both have suggested the answer is yes.

In *Olmstead*, the Supreme Court held that "undue institutionalization qualifies as discrimination 'by reason of . . . disability.'" 527 U.S. at 597-98.  But the textual sources on which the Court relied spoke of "segregation" and "isolation"—not merely "institutionalization."  *See, e.g.*, 42 U.S.C. § 12101(a)(2) ("[H]istorically, society has tended to *isolate* and *segregate* individuals with disabilities, and, despite some improvements, *such forms of discrimination* against individuals with disabilities continue to be a serious and pervasive social problem." (emphasis added)); 42 U.S.C. § 12101(a)(5) ("[I]ndividuals with disabilities continually encounter *various forms of discrimination*, including . . . *segregation*." (emphasis added)); 28 CFR § 35.130(d) ("A public entity shall administer services . . . in the *most integrated setting appropriate* to the needs of qualified individuals with disabilities." (emphasis added)).  So, too, did the Court itself.  *See, e.g.*, *Olmstead*, 527 U.S. at 597 ("Unjustified *isolation* . . . is properly regarded as discrimination based on disability." (emphasis added)); *id.* at 613-14 (Kennedy, *J.*, concurring in judgment) ("I deem it relevant and instructive that Congress in express terms identified the 'isolat[ion] and segregat[ion]' of disabled persons by society as a 'for[m] of discrimination' . . . .'" (alterations in original) (citations omitted)).  In short, although *Olmstead* answered only the question presented—whether the plaintiffs' institutionalization constituted discrimination—its rationale for finding in the affirmative was not limited to that specific scenario.

The Second Circuit's discussion of *Olmstead* in *Davis* similarly suggests that the integration mandate applies more broadly than only in the institutionalization context.  In *Davis*, the Second Circuit found that denying medical services that were necessary to avoid a "serious" or "substantial risk of institutionalization" constituted "unjustified

15

isolation on the basis of . . . disabilit[y] in violation of the integration mandate." 821 F.3d at 263-64. Notably, the state conceded that this denial would "severely exacerbate [the plaintiffs'] ailments, putting them at a substantial risk of requiring institutionalized care." *Id.* at 264. The court therefore had no occasion to decide whether an *Olmstead* claim may be premised on something other than institutionalization (or its imminent threat). But nothing in the opinion suggests that the Second Circuit would limit *Olmstead* to its facts. On the contrary, the Second Circuit suggested the opposite by reading *Olmstead* "broad[ly]." *Id.* at 260.

So neither the Supreme Court nor the Second Circuit has ever decided whether the integration mandate applies outside the context of institutionalization. But several other courts have addressed that question head on and found that it does apply.

For example, in *Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016), the Seventh Circuit vacated summary judgment in favor of the defendant state and found that Indiana may have violated the ADA and Section 504 by limiting certain "community time" services and supports to individuals who required a nursing-facility level of care. *Id.* at 908. As a consequence of the state's providing these supports "to some persons with disabilities, but not to [others]," *id.* at 913, the plaintiffs, who previously had relied on those services and supports to "enjoy community activities such as eating in restaurants, visiting flea markets, and window-shopping" had their "community time" quartered from forty to roughly ten hours per week, *id.* at 908. The Court reasoned that although *Olmstead* "had no occasion" to consider whether "the same evils it had identified for institutional placements might exist in some settings outside of an institution," there was "no reason why the same analysis should not apply" when an

individual needlessly is isolated in his home and that "its rationale . . . reaches more broadly." *Id.* at 910. "[I]solation in the home for a person 'who can handle and benefit from' time out in the general community," the court therefore held, also was "inconsistent with the integration mandate." *Id.*

Although the Seventh Circuit noted that "[t]he plaintiffs provided evidence that [the restriction placed them at] serious risk of being institutionalized," its holding explicitly was not limited to this scenario. Rather, the court said, "the integration mandate [may be] implicated where the state's policies have *either* (1) segregated persons with disabilities within their homes, *or* (2) put them at serious risk of institutionalization." *Id.* at 914 (emphasis added); *see also id.* at 918 ("If [Indiana's] programs in practice allow persons with disabilities to leave their homes only 12 hours each week, cooping them up the rest of the time, *or* render them at serious risk of institutionalization, then those programs violate the integration mandate unless the state can show that changing them would require a fundamental alteration of its programs for the disabled." (emphasis added)).

Several district courts have reached similar conclusions about the expansive reach of the integration mandate. In *Lane v. Kitzhaber*, 841 F. Supp. 2d 1199 (D. Or. 2012), for example, the court denied Oregon's motion to dismiss claims that the state's provision of only sheltered-workshop employment opportunities violated the integration mandate. *Id.* at 1204-05. The court rejected Oregon's argument that because the plaintiffs "[did] not allege that they [were] at risk for institutionalization, . . . the integration mandate . . . [did] not cover their claims." *Id.* The cases on which the state relied, the court explained, "were premised upon state action creating a risk of

residential institutionalization, [and so] that risk naturally was discussed.  However, the cases [did] not otherwise suggest that such a risk is the *sine qua non* of a Title II claim." *Id.* at 1205.  "To the contrary, the broad language and remedial purposes of the ADA, the corresponding lack of any limiting language in either the ADA or the integration mandate itself, and the lack of any case law restricting the reach of the integration mandate suggest[ed] just the opposite conclusion."  *Id.* (footnote omitted).

Likewise, in *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973 (D. Minn. 2016), the court explained that *Olmstead*'s "'two evident judgments' . . . , discussed . . . in the context of institutionalized isolation, [could] be applied equally to other forms of segregation that exclude individuals with disabilities from 'participating in community life' and 'diminish[ ] [their] everyday life activities' in a wide range of settings."  *Id.* at 1027. (third and fourth alterations in original) (quoting *Olmstead*, 527 U.S. at 600-01). "[U]njustified isolation [therefore was] properly regarded as discrimination based on disability' beyond the limited scope of institutionalization."  *Id.* (quoting *Olmstead*, 527 U.S. at 597).  And the plaintiffs, who were "between the ages of twenty-two and twenty-five and reside[d] at home with their parents," met the pleading standard.  *Id.* at 987. They had been "deemed eligible" for a state program that provided supports and services to facilitate independent living but had spent more than three years on a waiting list for that program.  *Id.*  In addition, the plaintiffs specifically alleged that they "wishe[d] to move out of [their] parents' home[s]" because they "[felt] isolated from the community in [their] current living arrangement[s]," "[sought] independence and integration into the community on a social, cultural and vocational level and desire[d]

interaction with peers with disabilities and without disabilities." *Id.* at 1029 (citations omitted).

In short, the plaintiffs' theory of liability here may be novel in the Second Circuit, but it has been tested and approved elsewhere.

What is more, the Department of Justice has embraced broader interpretations of the ADA and Section 504 than a literal reading of those statutes might suggest. Department of Justice guidance explains:

> Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities.   Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and [ ] provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible.

DOJ *Olmstead* Guidance.  "Because the integration mandate 'is a creature of the [DOJ's] own regulations,' [the] DOJ's interpretation of that provision is 'controlling unless plainly erroneous or inconsistent with the regulation.'"  *Davis*, 821 F.3d at 263 (alteration in original) (quoting *Auer v. Robbins,* 519 U.S. 452, 461 (1997)); *see also Olmstead*, 527 U.S. at 598 ("[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (quoting *Bragdon v. Abbott,* 524 U.S. 624, 642 (1998))).

And "the legislative history [of the ADA] makes clear that Congress considered the provision of segregated services to individuals with disabilities a form of discrimination prohibited by the ADA."  *L.C. by Zimring v. Olmstead*, 138 F.3d 893, 898 (11th Cir. 1998), *aff'd in part, vacated in part, remanded sub nom. Olmstead v. L.C. ex*

*rel. Zimring*, 527 U.S. 581 (1999) (citing S. Rep. No. 101-116 at 20 (1989) (noting a

"compelling need to provide a clear and comprehensive national mandate . . . for the

*integration* of persons with disabilities *into* the economic and social *mainstream of*

*American life*" (emphasis added)); H.R. Rep. No. 101-485, pt. 2, at 29 (1990), *as*

*reprinted in* 1990 U.S.C.C.A.N. 267, 310 (listing "segregation" as a form of

"[d]iscrimination against people with disabilities"); H.R. Rep. No. 101-485, pt. 3, at 26,

49-50 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 449, 472-73 ("The ADA is a

comprehensive piece of civil rights legislation which promises a new future: a future of

inclusion and integration, and the end of exclusion and segregation. . . . The purpose of

Title II is to continue to break down barriers to the integrated participation of people with

disabilities in all aspects of community life, . . . [and] integrated services are essential to

accomplishing the purposes of Title II. . . . Separate-but-equal services do not

accomplish this central goal and should be rejected."); *id.* at 26, *as reprinted in* 1990

U.S.C.C.A.N. at 448-49 ("[S]egregation for persons with disabilities 'may affect their

hearts and minds in a way unlikely ever to be undone.'" (quoting *Brown v. Board of*

*Educ.*, 347 U.S. 483, 494 (1954)))).

Finally, the Residents' expansive theory of integration fits comfortably with the

"familiar canon of statutory construction that remedial legislation should be construed

broadly to effectuate its purposes." *Henrietta D.*, 331 F.3d at 279 (quoting *Tcherepnin*

*v. Knight,* 389 U.S. 332, 336 (1967)).  The "ADA and Rehabilitation Act [are] both

remedial statutes."  *Id.* (citations omitted).  And even if the 1999 *Olmstead* court—or the

2016 *Davis* court—would not have considered home placement to be a segregated

setting, "societal attitudes and the responses of public authorities [change] from time to

time." *Olmstead*, 527 U.S. at 609 (Kennedy, *J.*, concurring).  So today, the most integrated setting, as discussed below, plausibly may be a community-based residential setting rather than the family home.

In sum, the Residents need not allege that they face an imminent risk of institutionalization to plead a viable claim under the ADA's and Section 504's integration mandates.  Allegations of unjustified segregation suffice.

        ii.        <u>Allegations of Disparate Treatment Are Not Required<br>Under Olmstead</u>

The state also argues that, even assuming the integration mandate encompasses unjustified isolation in a non-institutional setting, the plaintiffs' claims still fail because what they really are alleging is that they have been treated differently than other individuals with disabilities on a basis other than disability (that is, the availability of voluntary caregivers).  *See* Docket Item 17-1 at 19.  According to the state, such intra-class discrimination claims, premised on a classification other than disability, are not cognizable under the ADA and Section 504.  *See id.* at 20.  Although this argument is relevant to the Residents' disparate-treatment claim discussed below, it does not affect their *Olmstead* integration claims.

In *Davis*, the Second Circuit rejected the state's argument that there was no discrimination because the challenged statute "simply allocate[d] limited state resources *among* disabled individuals."  821 F.3d at 260 (emphasis in original).  In so holding, the court found it irrelevant that the challenged statute limited a certain support to individuals with disabilities who also had "a narrow set of medical conditions."  *Id.* at 261.  Claims premised on the integration mandate, the court explained, did not require the plaintiff to "identif[y] a 'comparison class.'"  *Id.* (quoting *Olmstead*, 527 U.S. at 598).

Rather, allegations of "'unjustified isolation' of disabled individuals in institutionalized care facilities constitutes discrimination on the basis of disability under the ADA." *Id.* at 262 (quoting *Olmstead*, 527 U.S. at 597).  That is so because "[i]n order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice."  *Olmstead*, 527 U.S. at 601.  In other words, unjustified isolation constitutes *per se* discrimination on the basis of disability— no comparator class is necessary.[4]  So the fact that some individuals with disabilities received the service while others did not, far from defeating the plaintiffs' claim, in fact was central to their claim.

---

[4] *See also Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) ("[D]iscrimination' as used in [Title II of the ADA] includes not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, *no matter how anyone else is treated.*" (emphasis in original) (citing *Olmstead*, 527 U.S. at 597-603)); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) (explaining that the integration mandate requires "public entities . . . to 'make reasonable modifications in policies, practices, or procedures' in order to avoid the discrimination *inherent* in the unjustified segregation of the disabled" (emphasis added) (quoting 28 CFR § 35.130(b)(7)); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 290 (E.D.N.Y. 2008) ("[U]nnecessary segregation of individuals with mental illness is discrimination *per se* and a violation of the ADA; no demonstration of differential treatment between individuals with mental illness and those without is required."); *see also* DOJ *Olmstead* Guidance ("[A]n *Olmstead* claim is distinct from a claim of disparate treatment or disparate impact and accordingly does not require proof of those forms of discrimination."); *cf. Henrietta D.*, 331 F.3d at 273 (holding that "a Title II plaintiff who wishes to proceed on a reasonable accommodation theory" need not "also establish disparate impact" because "the 'concept of discrimination' embraced by the ADA" does not "demand[ ] that plaintiffs identify a 'comparison class' of 'similarly situated individuals given preferential treatment'" (quoting *Olmstead*, 527 U.S. at 598)).

Similarly, in *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003), the Ninth Circuit found that the State of Washington had violated the integration mandate by providing only some individuals with disabilities the "option of receiving long-term living assistance and medical care in their own homes or adult family homes in the community." *Id.* at 514.   More specifically, while the "categorically needy" (defined by financial resources) had their choice of settings, the "medically needy" were limited to receiving "long-term medical care and living assistance in nursing home settings . . . or not at all." *Id.*  The Ninth Circuit framed the issue as "not whether the state must provide the long term care services sought by . . . the [medically needy]—the state [was] already providing these services—but in what location these services [must] be provided." *Id.* at 517. Significantly, in noting that Washington already provided the services sought by the medically-needy plaintiffs, the court referred not to the state's provision of these services to categorically-needy individuals but instead to its provision of these services in "the nursing home setting." *Id.*  In other words, what mattered was not that only some of those with disabilities received the services at issue (*i.e.*, disparate treatment vis-à-vis individuals with disabilities), but instead that the state provided services necessary to the plaintiffs' achieving greater community-integration ("assistance in dressing, bathing, preparing meals, taking medications, and so on") only in a segregated setting (*i.e.*, *per se* discrimination-by-isolation vis-à-vis individuals without disabilities).  *Id.*  The court remanded to the district court for a determination of whether "providing [these] services in community-based settings would fundamentally alter the nature of the services [Washington] currently dispenses to [the medically needy]." *Id.* at 518.

In short, while the Residents' allegations implicitly allege disparate treatment vis-à-vis other individuals with disabilities on a basis other than disability status (that is, the availability of relatives who can be caregivers), that allegation is not relevant to their *Olmstead* claim.  An *Olmstead* claim inherently alleges disparate treatment vis-à-vis individuals without disabilities and thus satisfies the requirement that an individual demonstrate exclusion "by reason of [her] disability."  42 U.S.C. § 12132; *cf.  Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 621-22 (9th Cir. 2005) (affirming grant of summary judgment to state on fundamental-alteration defense where plaintiffs alleged integration mandate violation because they had been placed on a waiting list for community-based care that "[was] available to all Medicaid-eligible disabled persons *as slots become available, based only on their mental-health needs and position on the waiting list*").  What matters is that the plaintiffs have *some* disability and allegedly are denied a service necessary to avoid segregation.  Whether or not the plaintiffs also allege disparate treatment is irrelevant.  The state therefore is incorrect that the Residents' claims are defeated by their separate allegations of intra-class disparate treatment.

       iii.       <ins>The Plaintiffs Have Not Plausibly Alleged that They Are Segregated in Their Homes</ins>

Having decided that the integration mandate is neither limited to claims that individuals with disabilities face a risk of institutionalization nor defeated by incidental claims of intraclass discrimination, the question becomes whether the Residents adequately have pleaded that they, in fact, are subject to unjustified isolation.  In that regard, the question is whether the Residents plausibly have alleged that the state has denied them placement in the "*most* integrated setting appropriate to their needs"—that

is, that that their family homes are not the setting that "enables [them] to interact with non-disabled persons to the fullest extent possible."  28 C.F.R. § 35.130(d) & App; *see also* DOJ *Olmstead* Guidance ("Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities.  Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible.").  The Court answers that question in two parts: First, is it possible, in an abstract sense, that home placement might not be the most integrated setting?  And second, have the plaintiffs pleaded facts in support of such a claim?

The abstract, theoretical injury here is no different than that identified in *Olmstead*.  In the same way that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," *Olmstead*, 527 U.S. at 600, so too might forcing adult children to live with their families reflect a belief that such individuals are unworthy—or at least incapable—of the same independent lifestyles expected of their peers without disabilities.  And in the same way that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment," *id.* at 601, so too might living at home diminish an adult's independence and capacity to assert, develop,

and pursue her own interests and goals.  Indeed, "although family relations might be enhanced at home if people are around, isolation in a home may often be worse than confinement to an institution on every other measure of 'life activities' that *Olmstead* recognized."  *Steimel*, 823 F.3d at 911.

The Court recognizes Department of Justice guidance that "in cases involving residential segregation in institutions or large congregate facilities, remedies should provide individuals opportunities to live in *their own apartments or family homes*, with necessary supports."  DOJ *Olmstead* Guidance (emphasis added).  But the fact that the Department of Justice lists the family home as one example of an appropriately integrated setting does not *ipso facto* meant that the family home is the *most* integrated setting for *every* individual with a disability.  That same guidance provides that "[r]emedies should focus on expanding the most integrated alternatives," *id.*, and thus contemplates a range of options.  While the most integrated setting appropriate to the needs of one individual may be a group home rather than a psychiatric hospital, for someone else such a placement may be too restrictive.  Similarly, for some individuals the family home may be the most integrated setting appropriate to their specific, individual needs; for others it may be too restrictive.  The inquiry focuses on the individual's needs and does not categorically declare any given setting the "most" integrated.

But the *theoretical* plausibility of the Residents' claims does not suffice to survive a motion to dismiss.  They must further allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Gamm*, 944 F.3d at 462

(quoting *Iqbal*, 556 U.S. at 678).  And in this respect, the Residents have not met their burden.

The Residents allege that the state has "excluded [them] from participation in the OPWDD's residential program," a decision that "effectively segregates [the p]laintiffs from participation in the community."  Docket Item 1 at 13, 15.  This alleged exclusion "violates [the state's] obligation to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" and "infantilizes [the Residents] by forcing [them] to live with family caregivers rather than in the community with peers."  *Id.* at 14, 15.  They further allege that "[s]uch unjustified isolation constitutes discrimination based on disability."  *Id.*  The Residents, each of whom is in her twenties or thirties, also claim that they are "capable of" and would "prefer" living in "the community in a supported residential setting," rather than their sexagenarian caregivers.  *See id.* at 6-9.

The Residents have done no more than assert "legal conclusion[s] couched as factual allegation[s]" and provide "a formulaic recitation of the elements of [the] cause of action."  *See Twombly*, 550 U.S. at 555.  Such conclusory assertions do not suffice to survive a motion to dismiss.  But because the Residents' claims are not implausible as a matter of law, the Court grants the plaintiffs leave to amend their complaint, if possible, to allege facts showing that their home placements effectively segregate them— perhaps in the manner described by the Department of Justice.[5]  The Residents also

---

[5] Under Rule 15(a) of the Federal Rules of Civil Procedure:

   (1)  A party may amend its pleading once as a matter of course within:

         (A) 21 days after serving it, or

should clarify the precise parameters of the "Hobson's choice" faced by their caregivers. *See* Docket Item 1 at 21.  In other words, what consequence would follow from the caregivers' simply refusing, tomorrow, to voluntarily provide care for the Residents?

### 3.    Fundamental-Alteration Defense

In the interests of judicial economy, the Courts notes that in amending their pleadings, the Residents need not allege facts addressing any possible fundamental-alteration defense that may be raised by the state.  It is true that a state may defeat a community-integration mandate claim by showing that "the placement can[not] be reasonably accommodated, taking into account the resources available to the [s]tate and the needs of others with mental disabilities."  *Olmstead*, 527 U.S. at 607 (plurality opinion).  But the fundamental-alteration argument is an "affirmative defense."  *Id.* (Stevens, *J.*, concurring in judgment); *see also Brown v. D.C.*, 928 F.3d 1070, 1077 (D.C. Cir. 2019) ("[T]he State bears the burden of proving the unreasonableness of a

---

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2) In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

*Id.*  This liberal standard "is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'"  *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

Because the plaintiffs now have the benefit of a ruling, they may, if possible, amend their complaint to set forth a cognizable claim.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

28

requested accommodation once the individual satisfies the first two requirements.");
*Steimel*, 823 F.3d at 916 ("It is the state's burden to prove that the proposed changes
would fundamentally alter their programs"—that is, "that its criteria are 'necessary for
the provision' of the [services at issue].").

So the state ultimately may defeat the plaintiffs' claims by showing that providing
supported, community-based residential placements to the plaintiffs would require it to
unfairly reduce the level of services and supports it presently provides to others with
disabilities.  Or the state might show that it has "a comprehensive, effectively working
plan for placing qualified persons with mental disabilities in less restrictive settings, and
a waiting list that moved at a reasonable pace not controlled by the [s]tate's endeavors
to keep its institutions fully populated."  *Olmstead*, 527 U.S. at 605-06.  In that case, this
Court would "have no warrant effectively to order displacement of persons at the top of
the community-based treatment waiting list by individuals lower down who commenced
civil actions."  *Id.* at 606.  But that argument is not appropriately considered at the
pleadings stage.  *See, e.g.*, *Mental Disability Law Clinic v. Hogan*, 2008 WL 4104460, at
*15 (E.D.N.Y. Aug. 28, 2008) ("Although plaintiff has not alleged the placement can be
reasonably accommodated, taking into account (a) the resources available to the State
and (b) the needs of others with mental disabilities, it would be inappropriate to dismiss
on these claims on this ground as defendants bear the burden of establishing
'fundamental alteration' as a defense." (citations omitted)); *Martin v. Taft*, 222 F. Supp.
2d 940, 972 (S.D. Ohio 2002) ("[W]hether [the] requested relief would entail a
fundamental alteration is a question that cannot be answered in the context of a motion
to dismiss.").

### B.      Counts Three and Four: Disparate Treatment Claims

The Residents' third and fourth claims allege that the state has treated them

differently from other individuals with disabilities.  That is to say, they allege that the

defendants impermissibly discriminated between two classes of individuals with

disabilities: those who have willing caretakers and those who do not, offering only the

latter supported, community-based residential placements.  The state contends that

such intra-class allegations of disparate treatment cannot support a discrimination

claim.[6]  The Court agrees with the defendants on the facts of this case and accordingly

dismisses those claims.

Even assuming that the ADA and Section 504 recognize claims of intra-class

discrimination,[7] the Residents have not alleged any facts supporting such a claim.  They

allege that the state has prioritized individuals in "emergency" situations over individuals

---

[6] To the extent the state's argument is that it has made reasonable choices in allocating limited resources, as discussed above, such a fundamental-defense argument may not be used to dismiss claims at the pleading stage.

[7] In *Amundson ex rel. Amundson v. Wisconsin Department of Health Services*, for example, the Seventh Circuit posited that "[i]f Wisconsin [bought] the best available care for persons with visual impairments, but pa[id] only for mediocre care for the developmentally disabled, then [the] plaintiffs [would] have a theory of discrimination even though all of them remain[ed] in group homes."  721 F.3d 871, 874 (7th Cir. 2013) (Easterbrook, *C.J.*).  The Court cited *Olmstead*, in which the Supreme "g[a]ve[ ] as an example [of intra-class discrimination] *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312 (1996), which concluded that discrimination against older persons within the class of all persons protected by the Age Discrimination in Employment Act—say, favoring 45 year olds over 60 year olds—could violate that statute." *Id.* (citing *Olmstead*, 527 U.S. at 598 n.10).  But because the *Amundson* plaintiffs "ha[d] not offered any comparison group or any standard by which 'worse treatment' could be identified," their claim could not survive.  *Id.*; *see also Nelson v. Milwaukee Cty.*, 2006 WL 290510, at *5 (E.D. Wis. Feb. 7, 2006) ("[T]o the extent that plaintiffs allege that defendants are treating them worse than persons with less severe disabilities, they may proceed as such claims allege differential treatment by reason of disability.").

who have "caregivers" willing and able to provide safe homes for them.  Docket Item 1 at 11.  Such a claim fails to allege that the state is treating the plaintiffs differently "*by reason* of [their] disability[ies]."  42 U.S.C. § 12132 (emphasis added).  The Residents' third and fourth claims therefore are dismissed with prejudice because amendment would be "futile."  *See Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) (citation omitted).

## IV.    CAREGIVERS' ASSOCIATIONAL CLAIMS

Finally, the Court considers whether the Caregivers plausibly have alleged that the state has discriminated against them on the basis of their association with the Residents.  And because the Court dismisses the Residents' disparate treatment claims, the question is whether the Caregivers may allege discrimination based on their association with individuals whose statutory right to integration has been denied.

The Second Circuit has explained that "to gain entry to the courts, non-disabled parties bringing associational discrimination claims need only prove [(1)] an independent injury [(2)] causally related to the denial of federally[-]required services to the disabled persons [(3)] with whom the non-disabled plaintiffs are associated."  *Loeffler*, 582 F.3d at 279 (Wesley, *J*., concurring and stating the opinion of the court on this issue).  In *Loeffler*, the court found this standard satisfied when two children were "compelled to provide sign language interpretation" for their hearing-impaired father while he was hospitalized, "forced [into] truancy from school, and involuntary[il]y expos[ed] to their father's suffering."  *Id.*  The court noted that the plaintiffs "[did] not claim that the [defendant hospital's] failure to provide a sign language interpreter injured them by preventing their father from coming home earlier or from providing care and

31

support.  Instead, they claim[ed] that they were forced to provide a service as a result of

the [h]ospital's failure to honor its federally[-]imposed obligation."  *Id.* at 281.

Here, the Caregivers allege that they "have no legal obligation to provide care and

services to [the Residents]," Docket Item 1 at 20, 22, and do so "only . . . out of love and

the necessity forced upon them by [the state's] failure to meet their legal obligations," *id.*

at 21, 23.  The Court agrees that such a claim mirrors that found viable by the Second

Circuit in *Loeffler*.

The state makes much of the fact that the discrimination underlying the instant

associational claim is for failure to integrate—not for disparate treatment or, as in

*Loeffler*, failure to accommodate.  *See* Docket Item 23 at 17-20.  But the state provides

no persuasive reason why this distinction should be material.  The Court in *Olmstead*

was clear that "[u]njustified isolation . . . is properly regarded as discrimination based on

disability."  527 U.S. at 597.  It therefore follows that "[u]njustified isolation" (so long as it

satisfies the other requirements of *Olmstead*, including not requiring the state to

fundamentally alter its programming) constitutes "the denial of federally[-]required

services to the disabled persons."  *See Loeffler*, 582 F.3d at 279.  And being forced to

provide care and services constitutes an "independent injury" that is "causally related" to

this denial.

The state also argues that the Caregivers lack standing because they "have no

particularized injury. . . . [I]t appears from the [c]omplaint that the relief sought would be

identical whether or not the [Caregivers] remain parties."  Docket Item 17-1 at 25.  The

state reads far too much into the requirement that a plaintiff "must have . . . suffered . . .

[a] 'particularized'" injury.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), as

revised (May 24, 2016).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Id.*  The purpose of this requirement is to ensure that a plaintiff has a "personal stake in the outcome of the controversy."  *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Even if the Residents and Caregivers seek the same relief, their alleged injuries are distinct.  The Residents allege segregation; the Caregivers allege the forced provision of care.  And although it is possible that retaining the Caregivers as parties to the action would not materially affect the relief ordered, that is neither necessarily true nor relevant.  On the contrary, it hardly can be argued that the Caregivers do not have a unique and "personal stake in the outcome of" this case that might shape the Court's understanding of the issues and any relief that might be awarded.

The Caregivers therefore have articulated a viable theory of discrimination.  But because the Court has dismissed the Residents' underlying claims, so too must the Caregiver claims' fail.  For the same reasons discussed above, however, the Court grants the Caregivers leave to amend their pleadings.

## ORDER

In light of the above, IT IS HEREBY

ORDERED, under Rule 25(d) of the Federal Rules of Civil Procedure, that the Clerk of Court shall replace Kerry Delaney, former acting Commissioner of OPWDD, with Dr. Theodore Kastner, Commissioner of OPWDD; and it is further

ORDERED that the plaintiffs' third and fourth claims are dismissed with prejudice; and it is further

ORDERED that the plaintiffs' first, second, fifth, and sixth claims are dismissed without prejudice; the plaintiffs may amend their complaint within 60 days of the date of this decision and order; and it is further

ORDERED that the plaintiffs' motion to certify two classes, Docket Item 3, is denied without prejudice as premature; and it is further

ORDERED that if the plaintiffs do not amend their complaint within 60 days of the date of this decision and order, the complaint will be dismissed without further order and the Clerk of Court shall close the case.


SO ORDERED.

Dated:   July 11, 2020
         Buffalo, New York


_/s/ Hon. Lawrence J. Vilardo_
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE