UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

H.A., by her guardians L.A. and S.A., and
L.A. and S.A. individually[1], *et al.*,

        Plaintiffs,

        v.

KATHLEEN HOCHUL[2], *in her official
capacity as Governor of the State of New
York*, *et al.*,

        Defendants.

_____

16-CV-735-LJV
DECISION & ORDER

On September 13, 2016, five plaintiffs with developmental disabilities and their caregivers filed a complaint under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. Docket Item 1. They alleged that the defendants, then-Governor Andrew Cuomo and Dr. Theodore Kastner, then-Commissioner of the New York State Office for People with Developmental Disabilities ("OPWDD") (collectively, "the state"), unlawfully had denied them access to OPWDD-funded programs that

---

[1] Former plaintiffs E.B., M.B., and R.B. are no longer parties to this action. The Clerk of the Court shall update the caption accordingly.

[2] Under Rule 25(d) of the Federal Rules of Civil Procedure, "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[, t]he officer's successor is automatically substituted as a party. . . . The court may order substitution at any time, but the absence of such an order does not affect the substitution." The Clerk of the Court shall replace defendant Andrew Cuomo, the former Governor of New York State, with Kathleen Hochul, the current Governor. The Clerk of the Court also shall replace defendant Dr. Theodore Kastner, the former Commissioner of OPWDD, with Kerri Neifeld, the current acting Commissioner.

provide supported and community-based residential placements.  *Id.*  The plaintiffs also moved to certify two classes.  Docket Item 3.

This Court granted the state's motion to dismiss on July 11, 2020.  Docket Item 30.  Although this Court determined that home-based segregation could plausibly constitute unjustified isolation under the ADA and Section 504, it concluded that the plaintiffs had not alleged facts sufficient to support that theory.  And because the associational claims of the caregiver plaintiffs hinged on whether the underlying claims of the individuals with developmental disabilities were viable, this Court concluded that those associational claims likewise failed.  But because neither set of claims was implausible as a matter of law, this Court granted the plaintiffs leave to amend their claims.[3]

The plaintiffs filed an amended complaint and again moved for class certification on September 8, 2020.  Docket Items 32, 33.  The state moved to dismiss the amended complaint on October 23, 2020.  Docket Item 38.  The plaintiffs responded on December 11, 2020, Docket Item 43, and on January 15, 2021, the state replied, Docket Item 48.

For the following reasons, the state's motion to dismiss the amended complaint is denied, and the plaintiffs' motion for class certification is denied without prejudice as premature.

---

[3] This Court also dismissed the plaintiffs' disparate treatment claims without leave to amend.  Docket Item 30 at 30-31.

**FACTUAL BACKGROUND**

The plaintiffs in this case comprise two discrete groups.[4] The Court first addresses the allegations of the "Residents"—"adults with developmental disabilities who [] qualify for services from [OPWDD]; [who] are not capable, by virtue of their developmental disabilities, [of] liv[ing] in the community without assistance and support; [who] are presently living . . . with parents and/or related caregiver(s); and [who] would prefer to live in the community in a supported residential setting but cannot because there are insufficient available appropriate residential settings." Docket Item 32 at ¶ 23. The Residents named as plaintiffs in this putative class action are five individuals residing in the Western District of New York: H.A., P.Y., P.M., M.M., and C.H.

Plaintiff H.A., a woman in her thirties, lives with her parents, L.A. and S.A. *Id.* at ¶ 28. Because H.A. is "non-verbal" and "generally non-ambulatory," she "uses assistive technology to communicate[,] requires total assistance with moving her wheelchair," and is "completely dependent upon her caregivers for all her daily living tasks." *Id.* at ¶ 30. As a result, H.A., who wakes before her parents and is put to bed "considerably before [she] is ready to go to sleep," spends much of her time "isolated and confined to her wheelchair . . . waiting for her parents to return to her" so that she can move about again. *Id.* at ¶¶ 36-43. H.A. attends a day habilitation program during the week and spends up to 4 hours outside with her parents each weekend. *Id.* at ¶¶ 38-46.

---

[4] The following facts are taken from the amended complaint and are presumed true for the purposes of this decision. *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016) (in reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff").

3

Plaintiff P.Y., a woman in her forties, lives with her mother, T.Y.  *Id.* at ¶ 67.  P.Y. is "not capable" of performing certain tasks, including preparing a meal or crossing the street, and she "does not tolerate being alone."  *Id.* at ¶¶ 71, 77.  P.Y. attends a day habilitation program but otherwise spends time only with her mother during the week.  *Id.* at ¶¶ 80-86.  She also visits her aunt biweekly.  *Id.* at ¶ 88.  On weekends, P.Y. and her mother go on walks, attend church services, and occasionally participate in church functions.  *See id.* at ¶¶ 90-91.  P.Y. makes monthly outings to bingo, the movies, and lunch and dinner, and she meets with other individuals with developmental disabilities three times each year.[5]  *Id.* at ¶ 94.

Plaintiff P.M., a man in his twenties, lives with his teenage sibling and their parents, S.M. and B.M.  *Id.* at ¶ 107.  P.M. "has difficulty with basic life tasks," occasionally "engages in inward[-]directed behaviors," "requires constant supervision," and has a "tendency to elope."  *Id.* at ¶ 109.  He does not attend a day habilitation program; instead, he spends most weekdays using the computer, looking at books, and running errands or walking the family dogs with S.M.  *Id.* at ¶¶ 115-20.  He also visits his grandparents during the week and goes to the gym with his father.  *Id.* at ¶¶ 123-24.  P.M.'s parents, who both work full-time jobs, stagger their work schedules to be with P.M.  *Id.* at ¶¶ 117-18.  On weekends, P.M. largely spends time at home or runs errands with his parents, although he attends an overnight program with other individuals with disabilities and a music and arts program twice each month.[6]  *Id.* at ¶¶ 127-29.

---

[5] Since the onset of the COVID-19 pandemic, P.Y.'s outings have decreased.  *See* Docket Item 32 at ¶ 97.

[6] P.M.'s overnight program has been suspended due to COVID-19.  Docket Item 32 at ¶ 132.

Plaintiff M.M., a man in his twenties, lives with his parents, M.M. and D.M.  *Id.* at ¶ 142.  M.M., who has been "diagnosed with Down Syndrome," is "somewhat independent" but performs household tasks or maintains personal hygiene only "if prompted."  *Id.* at ¶¶ 143, 145.  He attends a pre-vocational program during the week and otherwise spends time at home.  *Id.* at ¶¶ 150-51.  M.M. previously worked part-time at a gas station during the week, but he has not returned to his job since the onset of the COVID-19 pandemic.  *Id.* at ¶¶ 153, 166.  On weekends, M.M. goes bowling for half the year and visits friends or attends a recreational group during the other half.[7]  *Id.* at ¶¶ 157-59.

Finally, plaintiff C.H. is a woman in her twenties who lives with her parents, C.K. and J.G.  *Id.* at ¶ 179.  C.H. is non-verbal and totally non-ambulatory; she "requires total assistance with moving her wheelchair[] and is completely dependent upon her caregivers for all her daily living tasks."  *Id.* at ¶ 181.  C.H. normally attends a day habilitation program four days each week but otherwise interacts only with her parents and her doctor during the week.  *Id.* at ¶¶ 187, 192, 194.  On Saturdays, C.H. spends three or four hours with a private aide who takes her shopping and out to eat.  *Id.* at ¶ 196.  On Sundays, C.H. accompanies her parents on errands and attends church with them.[8]  *Id.* at ¶ 197.

The Resident plaintiffs allege that their current schedules are dictated by their caregivers' availability and responsibilities rather than their own needs.  *See id.* at ¶¶

---

[7] M.M.'s recreational group has suspended operations during the COVID-19 pandemic.  Docket Item 32 at ¶ 165.

[8] Since the onset of the COVID-19 pandemic, C.H. no longer attends her day habilitation program, nor does she see her private aide.  Docket Item 32 at ¶¶ 198-99.

62, 103, 138, 174, 208.  They also allege that their lives would be more comparable to adults without disabilities if they lived in community-based residential placements, and they claim that they would be able to participate in more community outings and programs of their liking if they lived in those placements.  *See id.* at ¶¶ 64-65, 104-05, 139-40, 175-77, 209-10.  As a result, the Residents would prefer to live in community-based residential placements maintained by OPWDD rather than in their caregivers' homes.  *See id.* at ¶ 23.

The Residents do not reside in community-based residential placements, however, because "[t]he limited number of available supported community residential placements [are] used" only for individuals with disabilities who face "acute emergency situations, such as being an imminent risk of harm to themselves or others" or those who "are in imminent danger of homelessness."  *Id.* at ¶ 226.  As a result of that prioritization policy, "over 11,000 persons with developmental disabilities statewide[] . . . have requested and are awaiting placement in an appropriate supported community residential setting."[9]  *Id.* at ¶ 222.

The second group of plaintiffs, the "Caregivers," are "the parents and/or related caregivers who [] provide housing, care and services to the [Residents]" even though they "are not legally obligated to do so" because the Residents "are not capable[] . . . [of] liv[ing] in the community without assistance and support."  *Id.* at ¶ 24.  Like the Residents, the Caregivers "would prefer that the [] Residents live in the community in a supported residential setting."  *Id.*  But the Caregivers instead must house the Residents

---

[9] The plaintiffs have supplied statistics as of 2016; they allege that the numbers at the time of the amended complaint were "substantially the same."  Docket Item 32 at ¶¶ 222-25.

6

themselves because the Residents "would become instantaneously homeless" if the Caregivers did not.  *Id.* at ¶ 289.  The Residents' homelessness "would continue until either [] the [Resident] was harmed or killed[] or [] an appropriate governmental official . . . became aware of [the Residents'] plight."  *Id.* at ¶ 290.  Although the Caregivers therefore provide for the Residents to avoid that fate, they allege that this "only postpones the inevitable . . . circumstances that will unfold" when the Caregivers "die[] or become[] infirm."  *Id.* at ¶ 295.

## **LEGAL PRINCIPLES**

To decide a motion to dismiss for failure to state a claim upon which relief may be granted, courts "ask whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "The court accepts as true all well-pleaded factual allegations in the complaint [and] draws all reasonable inferences in favor of the nonmoving party."  *Id.* (citation and internal quotation marks omitted).  But courts "are not bound to accept as true a legal conclusion couched as a factual allegation," nor will "a formulaic recitation of the elements of a cause of action" suffice.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

**DISCUSSION**

As explained in this Court's prior decision, Docket Item 30, a plurality of the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), concluded that if states provide treatment to individuals with disabilities, they must, within financial reason, do so in the most community-integrated setting appropriate to each individual's needs. *Id.* at 607. The Court rested that conclusion on "two key determinations" apparent from the Department of Justice's implementing regulations for Title II of the ADA: the integration mandate and the fundamental-alteration defense. *Id.* at 596-97.

The integration mandate provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* at 592 (quoting 28 C.F.R. § 35.130(d)). And the "'most integrated setting appropriate to the needs of qualified individuals with disabilities' [] mean[s] 'a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'" *Id.* (quoting 28 C.F.R. pt. 35, App. A, p. 450).

The fundamental-alteration defense qualifies the integration mandate. It provides that a "public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* (quoting 28 C.F.R. § 35.130(b)(7)). In other words, a state can "resist modifications that 'would fundamentally alter the nature of the service, program, or activity.'" *Id.* at 597 (quoting 28 C.F.R. § 35.130(b)(7)).

Taken together, a plurality of the Court read the integration mandate and fundamental-alteration defense as requiring a state to "provide community-based treatment for persons with mental disabilities" when (1) "the [s]tate's treatment professionals determine that such placement is appropriate"; (2) "the affected persons do not oppose such treatment"; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the [s]tate and the needs of others with mental disabilities." *Id.* at 607.  But the Court did not hold that the ADA "imposes on [states] a standard of care for whatever medical services they render" or "requires [s]tates to provide a certain level of benefits to individuals with disabilities." *Id.* at 603 n.14 (citation and internal quotation marks omitted).  Instead, states must "adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id.*

This Court previously determined that the Residents' current living situation in their caregivers' homes could plausibly constitute unjustified isolation and therefore violate the integration mandate.[10]  *See* Docket Item 30 at 14-26.  But this Court concluded that the plaintiffs had alleged only "legal conclusions couched as factual allegations" to support that claim.  *See* Docket Item 30 at 27 (alterations omitted) (quoting *Twombly*, 550 U.S. at 555).  Nevertheless, because the Residents' claims were not legally implausible, this Court gave the plaintiffs leave to amend to allege facts

---

[10] This Court also determined that the Residents had not plausibly alleged that the state's failure to provide them with community-based residential placements now would likely result in their institutionalization in the future. *See* Docket Item 30 at 14 (citing *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016)).  The plaintiffs apparently are no longer pursuing this theory. *See* Docket Item 43 at 23 (arguing that the "[p]laintiffs have a statutory right to relief" based on "unjustified isolation and segregation within the home" and that "[l]ack of risk of institutionalization is not relevant for that inquiry").

9

"showing that their home placements effectively segregate them—perhaps in the manner described by the Department of Justice." Docket Item 30 at 27. And because the Caregivers' associational claims hinged on the Residents' underlying claims, this Court dismissed the Caregivers' claims with leave to amend as well. *Id.* at 33.

The plaintiffs now have filed an amended complaint with allegations that the Residents' current living situations violate the integration mandate. Because this Court concludes that the Residents and the Caregivers now have stated viable claims under the ADA and Section 504, the Court denies the state's motion to dismiss.[11]

## I.   THE RESIDENTS' UNJUSTIFIED ISOLATION CLAIMS

As an initial matter, the state argues that the Residents' allegations in the amended complaint turn *Olmstead* and the integration mandate "on their heads." Docket Item 38-1 at 7. That is, the state contends that the plaintiffs' claims in this case should be dismissed because "most classic *Olmstead* cases involve plaintiffs seeking support to move from an institutionalized setting to their family home," not the other way around. *See* Docket Item 48 at 2; *see also* Docket Item 38-1 at 14 ("Living at home with one's family is the opposite of institutionalization."). Accepting the Residents' claims here, the state argues, would mean accepting that "more institutionalized settings, with their higher staffing levels, would always be better"—the "exact opposite of what *Olmstead* and its progeny envisioned." Docket Item 48 at 5.

---

[11] As explained in this Court's prior order, courts "treat claims under [Title II and Section 504] identically in most cases." Docket Item 30 at 5 (internal quotation marks omitted) (quoting *Davis*, 821 F.3d at 259).

But that is all water under the bridge at this point.  This Court already rejected that argument when it decided that home isolation could violate the integration mandate just as institutionalization can.  *See* Docket Item 30.  So the fact that the Residents would prefer to live in a community-based residential placement rather than their caregivers' homes does not "st[and] [*Olmstead*] on its head."  *See* Docket Item 48 at 2.  On the contrary, for all the reasons detailed in this Court's prior decision, *see* Docket Item 30, the Residents' claims fit comfortably within *Olmstead*'s interpretation of the integration mandate.

The viability of the Residents' claims therefore depends not on where they reside but on whether they are unjustifiably isolated there.  The Residents allege that their current living situations deprive them of autonomy and independence and make them dependent on the availability of their caregivers.  *See, e.g.*, Docket Item 32 at ¶¶ 62, 103, 138, 174, 208; *see also id.* at ¶ 172 ("M.M. has also complained of lack of privacy due to living with his parents, and strongly desires the privacy that would come with living in a supported or supervised apartment.").  And the Residents allege that they would be able to participate in more community outings and programs if they were no longer beholden to their caregivers' schedules.  *See id.* at ¶¶ 64-65, 104-05, 139-40, 175-77, 209-10.  To support these allegations, the Residents offer their daily schedules, which detail their reliance on their caregivers for interaction, stimulation, and transportation.  *See, e.g., id.* at ¶¶ 43 ("While her parents are . . . attending to [] daily chores, H.A. is isolated and confined to her wheelchair without any interpersonal stimulation, and is essentially waiting for her parents to return to her."); 181 (C.H.

"requires total assistance with moving her wheelchair[] and is completely dependent upon her caregivers for all her daily living tasks").

Those allegations fall squarely within the Department of Justice's interpretation of an integrated setting. In the Department of Justice's view, integrated settings "afford individuals *choice* in their daily life activities." See U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, https://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020) (emphasis added). In other words, "[i]ntegrated settings . . . offer access to community activities and opportunities at times [and] frequencies and with persons of an individual's choosing." *Id.* The Residents allege that they are deprived of those very choices because of their dependence on their caregivers and their resulting segregation in their family homes. And they allege that their dependence on their caregivers' schedules limits their ability to interact with the community at large.[12]

Facts similar to those raised here have been accepted as sufficient to state viable integration-mandate claims. For example, in *Guggenberger v. Minnesota*, 198 F.

---

[12] The state makes much of the fact that the Residents are "incapable of living in the community without assistance [and] support" and that they therefore would remain dependent on other "caregivers for certain wants or needs" in a community-based residential placement. *See, e.g.*, Docket Item 38-1 at 18. But as a matter of common sense, the Residents' dependence on the availability of their caregivers plausibly makes their homes more isolating than a community-based residential placement. Many of the Caregivers work full- or part-time jobs, *see* Docket Item 32 at ¶¶ 48, 117-18, 162; the Residents allege that their lives in a community-based residential placement would be more integrated if they were no longer tethered to those restricted schedules, *see id.* at ¶¶ 62, 103, 138, 174, 208. So even if the Residents would still rely on the availability of caregivers for assistance and support in a community-based residential placement, that does not necessarily mean that those placements are equally restrictive.

12

Supp. 3d 973 (D. Minn. 2016), four named plaintiffs "between the ages of twenty-two and twenty-five" who "reside[d] at home with their parents" claimed that the state's failure to take them off a waiting list for state services them isolated at home. *Id.* at 987, 1029. The *Guggenberger* court "conclude[d] that [the plaintiffs] ha[d] adequately alleged that they [were] suffering from unjustified isolation and segregation" in violation of the integration mandate, citing one plaintiff's allegations that she "wishe[d] to move out of her parents' home" and "fe[lt] isolated from the community in her current living arrangement," another's claims that he "often fe[lt] stuck at home" and "experience[d] isolation and disconnectedness from the community," and a third plaintiff's allegations that he "desire[d] more independence and integration into the community on a social and cultural level." *Id.* at 1029 (citations and internal quotation marks omitted). And in *Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016), the Seventh Circuit concluded that if a state's "programs in practice allow persons with disabilities to leave their homes" for a limited amount of time each week, "cooping them up the rest of the time, . . . then those programs violate the integration mandate unless the state can show that changing them would require a fundamental alteration of its programs for the disabled." *Id.* at 918 (vacating summary judgment in favor of the defendant state on integration-mandate claim).

      The state contends that the Residents already "engage and participate in a wide range of programs and services." Docket Item 38-1 at 7. But that misses the point. The Residents allege that their schedules are significantly circumscribed due to the limited availability of their caregivers. So even if some Residents attend day habilitation programs during the week or make limited excursions into the community on weekends,

13

that does not mean that their family homes are necessarily the "*most* integrated setting appropriate to the[ir] needs." 20 C.F.R. § 35.130(d) (emphasis added).

As the plaintiffs correctly argue, "there is no numeric threshold . . . that distinguishes the 'most integrated setting' from a less integrated one." Docket Item 43 at 23 (quoting *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 463 (6th Cir. 2020)). And at this early stage, this Court does not have the tools to determine whether the Residents' current integration is enough integration.[13] The Residents have plausibly alleged that their home residences are not the most integrated setting appropriate for their needs. That is enough to state a viable claim, and the fact that some Residents already attend day habilitation programs or participate in community outings does not suggest otherwise.

Finally, the state argues that accepting the Residents' claims here could "impose significant additional costs on the State," and it suggests that the state's "waiting list and need-based placement procedures are functioning in a timely manner."[14] Docket Item

---

[13] The state details the facts alleged as to each Resident and attempts to demonstrate that each is getting more integration at home than he or she would get in an institutional setting—or at least that each Resident is getting enough integration to overcome their claim of unjustified isolation. *See, e.g.*, Docket Item 38-1 at 15-21. And the state accuses the plaintiffs of pleading conclusions, not facts. *See id.* In doing so, however, the state raises the very sort of factual issues that are inappropriate to decide on a motion to dismiss. The Residents have alleged that their dependence on their caregivers' schedules has left them isolated in their homes for much of the day. There is nothing conclusory about that. And the Residents have alleged that if they were placed in community-based residential settings, with professional caregivers that do not have the same restricted availability as their current caregivers, they would not be so isolated. That may or may not be true, but that is a factual issue inappropriate to decide on this motion.

[14] The state also invokes the specter of the slippery slope. "According to [the plaintiffs'] logic," the state reasons, "every integration[-]mandate claim states a claim for relief" because claims of what "could be" would suffice. Docket Item 48. Not so. Here, the Residents have plausibly alleged that they are unjustifiably segregated in their

14

38-1 at 6, 25.  In other words, the state apparently contends that its current system is adequate and that placing the Residents in community-based residential settings "can[not] be reasonably accommodated" after "account[ing] [for] the resources available to the [s]tate and the needs of others with mental disabilities."  *Olmstead*, 527 U.S. at 607 (plurality opinion).  And the state may well ultimately demonstrate that it already has a "comprehensive" and "effectively working plan" for accommodating the Residents' requests.  *Id.* at 605-06.  Or it may show that accommodating the Residents' requests would mean unfairly reducing services to others with disabilities.  If the state does that, then this Court would "have no warrant [] to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions."  *Id.* at 606.  But while that fundamental-alteration defense may ultimately mean that the plaintiffs are not entitled to the relief they seek, this Court already has determined that it does not sink their claims at this stage.  *See* Docket Item 30 at 28-29.

In sum, this Court need not decide today whether the Residents must be placed in community-based residential settings or whether the state's current plan to provide those placements is adequate.  It is enough that the Residents have "state[d] a claim to relief that is plausible on its face."  *Gamm*, 944 F.3d at 462 (quoting *Iqbal*, 556 U.S. at 678).  The Residents here have alleged that the state's failure to provide adequate community-based residential placements has left them isolated in their homes and has deprived them of their independence and autonomy.  Because that is enough to state a

---

homes.  And they have plausibly alleged that placement in a community-based residential setting would put them in the most integrated setting appropriate to their needs.  That is a claim about the Residents' current isolation and how it would be remedied, and that is sufficient to state a viable claim at the pleadings stage.

15

viable claim that the state has violated the integration mandate, the state's motion to dismiss the Residents' claims is denied.

## II.     THE CAREGIVERS' ASSOCIATIONAL CLAIMS

This Court previously determined that the Caregivers could bring an associational discrimination claim based on their allegations that the state's failure to provide sufficient community-based residential placements forced them to fill the gap. *See* Docket Item 30 at 31-33.  But because this Court dismissed the Residents' underlying claims that their current living situation constituted unjustified isolation, it accordingly dismissed the Caregivers' associational claims.  *See id.*

In the amended complaint, the plaintiffs now have clarified the "Hobson's choice" faced by the Caregivers: "either [] allow their loved one[s] to become homeless, hospitalized, or left to an unknown fate" or provide the care themselves.  *See* Docket Item 32 at ¶¶ 287-95; 315-17.  In other words, the Caregivers must provide care for their children to prevent their children from becoming "instantaneously homeless."  *Id.* at ¶ 289.  As this Court previously concluded, that forced provision of care is an independent injury causally related to the Residents' alleged injury here.  *See* Docket Item 30 at 31-33.

In short, the Caregivers have alleged a viable theory of discrimination based on their association with the Residents.  And because the Residents have now stated a plausible claim that the state has violated the integration mandate, the Caregivers' associational discrimination claims likewise may proceed.

### III.  CLASS CERTIFICATION

Finally, the plaintiffs move to certify the Residents and the Caregivers as plaintiff classes.  *See* Docket Item 33.  The state opposes that motion as premature and "anticipate[s] that narrow discovery . . . will be required before class certification issues can be fully briefed."  Docket Item 38-1 at 29.  For their part, the plaintiffs apparently concede that discovery may well be necessary for full briefing on their class certification motion. *See* Docket Item 43 at 28 ("Plaintiffs will, of course, comply with the Court's directives on . . . discovery and briefing schedules concerning class certification.").

In light of the potential necessity for further discovery to refine the question of class certification, the plaintiffs' motion for class certification, Docket Item 33, is denied without prejudice as premature.  *See Paulino v. Conopco, Inc.*, 2016 WL 11472229, at *1 (E.D.N.Y. Sept. 28, 2016) (denying class certification motion made before discovery without prejudice).

## **CONCLUSION**

For the reasons stated above, the state's motion to dismiss, Docket Item 38, is DENIED, and the plaintiffs' motion for class certification, Docket Item 33, is DENIED without prejudice as premature.

SO ORDERED.

Dated: February 7, 2022
        Buffalo, New York

                                      */s/ Lawrence J. Vilardo*
                                  LAWRENCE J. VILARDO
                                  UNITED STATES DISTRICT JUDGE