UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

C.H., by her guardians J.G. and C.K., and
J.G. and C.K., individually[1], et al., on
behalf of themselves and all other
similarly situated,

        Plaintiffs,

   v.

KATHLEEN C. HOCHUL, in her official
capacity as Governor of the State of New
York, et al.,

        Defendants.

———————————————————

16-CV-735-LJV
DECISION & ORDER

On September 8, 2020, a group of plaintiffs with developmental disabilities and

their caregivers filed an amended complaint under Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-34, and Section 504 of the Rehabilitation

Act of 1973 ("Section 504"), 29 U.S.C. § 794.  Docket Item 32.  They alleged that the

defendants—Andrew Cuomo, then Governor of the State of New York; and Dr.

Theodore Kastner, then Commissioner of the New York State Office for People with

Developmental Disabilities ("OPWDD") (collectively, "the defendants")—unlawfully

denied them access to OPWDD-funded programs that provide supported and

community-based residential placements ("CROs").[2]  *Id.*  On February 7, 2022, this

---

[1] Former plaintiffs H.A., L.A., and S.A. are no longer parties to this action.  The
Clerk of the Court shall update the caption accordingly.

[2] A state official testified that "CRO" stands for "[c]ertified residential
opportunities."  Docket Item 87-7 at 16.  The plaintiffs generally use "community
residential placement" to refer to such opportunities or placement but sometimes use

Court denied the defendants' motion to dismiss the amended complaint.  Docket Item 50.

On May 9, 2022, this Court referred the case to United States Magistrate Judge Jeremiah J. McCarthy for pre-trial matters under 28 U.S.C. § 636(b)(1)(A).  Docket Item 57.  On April 3, 2023, the referral order was amended to include dispositive motions under 28 U.S.C. § 636(b)(1)(B).  Docket Item 86.  On May 3, 2023, the plaintiffs moved for class certification, Docket Item 87; on July 7, 2023, the defendants responded, Docket Item 92; and on August 7, 2023, the plaintiffs replied, Docket Item 93.  Judge McCarthy then heard oral argument, Docket Item 94,[3] and on February 28, 2024, he issued a Report and Recommendation ("R&R") finding that the motion for class certification should be denied.  Docket Item 97.

On April 15, 2024, the plaintiffs objected to the R&R, arguing that Judge McCarthy incorrectly found that they did not satisfy Federal Rule of Civil Procedure 23(b).  Docket Item 100 at 7-12.[4]  On June 6, 2024, the defendants responded to the objections, Docket Item 105; and on June 27, 2024, the plaintiffs replied, Docket Item 106.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must

---

the state's terminology.  *See, e.g.*, Docket Item 100 at 4.  Neither side suggests that the difference between the labels affects this Court's analysis.

[3] After oral argument, the parties submitted additional briefing to address the potential relevance of a Second Circuit case, *Elisa W. v. City of New York*, 82 F.4th 115 (2d Cir. 2023), to the motion for class certification.  *See* Docket Items 95 and 96.

[4] Page numbers in docket citations refer to ECF pagination.

review de novo those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objections, responses, and replies; and the materials submitted to Judge McCarthy.  Based on that de novo review—and based largely on caselaw that the parties did not cite to Judge McCarthy—the Court respectfully rejects the recommendation in the R&R, finds that the plaintiffs have adequately established the requirements for class certification, and certifies the class and subclasses.

## **FACTUAL BACKGROUND**[5]

The plaintiffs seek to certify two subclasses:  "Residents" and their "Caregivers."

The proposed "Residents" subclass consists of "adults with developmental disabilities who [] qualify for services from [OPWDD]; [who] are not capable, by virtue of their developmental disabilities, [of] liv[ing] in the community without assistance and support; [who] are presently living . . . with parents and/or related caregiver(s); and [who] would prefer to live in the community in a supported residential setting but cannot because there are insufficient available appropriate residential settings."  Docket Item 32 at ¶ 23.

---

[5] On a motion for class certification, "the plaintiff's pleadings are assumed to be true."  *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014).  "[T]he court must nevertheless conduct a rigorous analysis to determine whether a class action is appropriate, considering materials outside [] the pleadings and weighing conflicting evidence as necessary."  *Id.*  The following facts are taken from the amended complaint, Docket Item 32, and the parties' other filings as noted.

The Residents named as plaintiffs are C.H., P.Y., and P.M.*, see* Docket Item 84, adults with developmental disabilities who live with their parents, *see* Docket Item 32 at ¶¶ 67, 107, 179.  They allege that their current schedules are dictated by their caregivers' availability and responsibilities rather than their own needs.  *See id.* at ¶¶ 103, 138, 208.  They also allege that their lives would be more comparable to adults without disabilities if they lived in CROs, and they claim that they would be able to participate in more community outings and programs of their liking if they lived in those placements.  *See id.* at ¶¶ 104-05, 139-40, 209-10.  As a result, they would prefer to live in CROs maintained by OPWDD rather than in their caregivers' homes.  *See id.* at ¶ 23.

The Residents do not reside in CROs, however, because "[t]he limited number of available supported community residential placements [are] used" only for individuals with disabilities who face "acute emergency situations, such as being an imminent risk of harm to themselves or others" or who "are in imminent danger of homelessness."  *Id.* at ¶ 226.  As a result of that policy, thousands of people with developmental disabilities statewide have requested and are awaiting placement in an appropriate CRO.  *Id.* at ¶ 222.

The proposed "Caregivers" subclass consists of "the parents and/or related caregivers who," even though they "are not legally obligated to do so," provide Residents with "housing, care and services" because the Residents "are not capable[] . . . [of] liv[ing] in the community without assistance and support."  *Id.* at ¶ 24.  Like the Residents, the Caregivers would prefer that the Residents live in CROs.  *Id.* But the Caregivers instead must house the Residents themselves because the Residents "would become instantaneously homeless" if the Caregivers did not.  *Id.* at

¶ 289.  The Caregivers named as plaintiffs are J.G., C.K., T.Y., S.M., and B.M.  *See* Docket Item 84.

The plaintiffs allege that the state has "failed, and [is] continuing to fail, to plan for and provide sufficient appropriate residential services, including [CROs], necessary to prevent the unjustified isolation of adults with developmental disabilities and prevent the adverse impact on the residential voluntary caregivers for these adults."  Docket Item 32 at ¶ 9.  The plaintiffs say that the state also has "failed to develop sufficient procedures and mechanisms, including financing mechanisms, to support the constitutionally and legislatively required system of services for individuals entitled to and in need of [CROs]."  *Id.* at ¶ 230.  The plaintiffs allege that their participation in CROs can be accommodated "with reasonable modification in policies, practice, or procedures," *id.* at ¶ 256, and they seek injunctive and declaratory relief, *id.* at 36.

After this Court denied the state's motion to dismiss the amended complaint, the plaintiffs deposed an OPWDD official who testified about the CRO process.  *See* Docket Item 87-7.  The official explained that OPWDD reviews referrals for people with disabilities and if it determines that a person "has a need for a [CRO]," it "assign[s the person] a level of need category."  *Id.* at 35-36.  In order of urgency from highest to lowest, the levels of need are "emergency," "substantial," and "current."  *Id.* at 51-52.  OPWDD also completes an assessment that gives a person an "adaptive health and behavior score" based on his or her behavioral, medical, and staffing needs.  *Id.* at 26-29.  Based on a person's individual needs, OPWDD assigns the person a particular "[r]esidential [t]ype."  *Id.* at 57.  For example, a person may need an "individualized residential alternative" setting, which often is called a "group home."  *Id.* at 57-58.

The state maintains a list of individuals who need CROs.  The list includes the levels of need, adaptive health and behavior scores, and residential need types.  *Id.* at 26-28, 51, 57.  The plaintiffs narrowed the lists to those in the Western District of New York who are at least 21 years old, live with their family or friends, and are eligible for a CRO.  *See* Docket Item 87-2 at ¶¶ 9, 11, 19.  The plaintiffs determined that there are 724 people, including the three named plaintiffs, in those categories and that they constitute the proposed Resident subclass.  *Id.* at ¶¶ 21-22.  About 25% have an emergency need for a CRO; 41% have a substantial need; and 33% have a current need.  *See* Docket Item 100-2 at 2.  Although there were some blanks in the data, the state had designated a type of residential need for more than 80% of the proposed class members.  *See id.*  For those with a listed type of residential need, more than 65% have supervised individualized residential alternative as the type of setting that they need.  *See id.*

In response, the defendants say that New York is doing as well as it can in meeting the complex needs and desires of Residents and Caregivers.  *See* Docket Item 92 at 11-13.  They note that even though "New York [h]as the largest certified residential housing system in the country, there are limited placements for individuals with developmental disabilities."  *See* Docket Item 105 at 3.  The same state official who was deposed submitted a declaration saying that "[t]here were approximately 1,147 individuals in the CRO system for [Western New York and Finger Lakes region] who had an unmet need as of [] December 31, 2022," Docket Item 92-1 at ¶ 53, 20% of whom were designated as having an emergency need, *id.* at ¶ 54.  The median wait time for CRO placement for those with an emergency need is four months; for those

with a substantial need it is seven months; and for those with a current need it is six

months. *Id.* at ¶ 56. "As of December 31, 2022, there were approximately 35

individuals designated as [e]mergency [n]eed who had been waiting five years or more

for placement." *Id.* at ¶ 57.

## LEGAL PRINCIPLES

Federal Rule of Civil Procedure 23 lists the requirements for certification of class

actions.

First, the court must "ascertain whether the claims meet the preconditions of Rule

23(a)." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d

196, 201-02 (2d Cir. 2008). Those preconditions are: "(1) the class is so numerous that

joinder of all members is impracticable; (2) there are questions of law or fact common to

the class; (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and (4) the representative parties will fairly and

adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "These

requirements are known as numerosity, commonality, typicality, and adequate

representation." *Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023).

A proposed class also must meet at least one of the three requirements in Rule

23(b). *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).

Here, the plaintiffs assert that the proposed class satisfies two of those requirements:

Rule 23(b)(2), which permits class certification if "the party opposing the class has acted

or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole";

and Rule 23(b)(3), which permits class certification if "the court finds that the questions

7

of law or fact common to class members predominate over any questions affecting only individual members[ ] and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met."  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).

Although the parties did not cite the relevant caselaw to Judge McCarthy, courts commonly certify classes in cases involving challenges to governmental policies and practices under the ADA and Section 504.  *See Lane v. Kitzhaber*, 283 F.R.D. 587, 595 (D. Or. 2012) (observing that "in almost every case [of this type] . . . courts have certified a class."); *Jennings ex rel. Jennings v. Wolf*, 2022 WL 16635644, at *22 (M.D. Pa. Nov. 2, 2022) (observing that it was "not alone in finding that a class of intellectually disabled persons who may allegedly suffer a common injury due to some state action may be properly certified under Rule 23" and that "[on] the contrary, courts that have considered similar putative class claims have frequently certified these cases as class actions."); 7 Newberg & Rubenstein on Class Actions § 23:4 (6th ed. 2024) (collecting cases and observing that "[d]isability discrimination class actions are often certified in the non-employment setting.")  Moreover, it is "particularly true" that courts regularly certify classes in "cases alleging a violation of the integration mandate of the ADA."[6] *Lane*, 283 F.R.D. at 595.

---

[6] Indeed, a search of class actions raising integration mandate claims revealed that most courts have granted class certification.  At least nineteen district courts, including three in this circuit, granted class certification in such cases.  *See Conn. Off. of Prot. & Advoc. for Pers. with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 289 (D. Conn. 2010); *Mental Disability L. Clinic v. Hogan*, 2008 WL 4104460, at *23 (E.D.N.Y.

**DISCUSSION**

Because he found that the plaintiffs did not satisfy Federal Rule of Civil

Procedure 23(b)(2) or 23(b)(3), Judge McCarthy did not determine whether the

proposed subclasses satisfied the Rule 23(a) requirements of numerosity, commonality,

---

Aug. 28, 2008); *Lovely H. v. Eggleston*, 235 F.R.D. 248, 255-58 (S.D.N.Y. 2006); *see also B.D. ex rel. Wellington v. Sununu*, 2024 WL 4227544, at *19 (D.N.H. Sept. 18, 2024); *Fitzmorris v. N.H. Dep't of Health & Hum. Servs.*, 2023 WL 8188770, at *27 (D.N.H. Nov. 27, 2023); *Jonathan R. v. Justice*, 344 F.R.D. 294, 317 (S.D.W. Va. 2023); *Jennings ex rel. Jennings v. Wolf*, 2022 WL 16635644, at *22 (M.D. Pa. Nov. 2, 2022); *Murphy v. Piper*, 2017 WL 4355970, at *15 (D. Minn. Sept. 29, 2017); *Steward v. Janek*, 315 F.R.D. 472, 493 (W.D. Tex. 2016); *O.B. v. Norwood*, 2016 WL 2866132, at *5 (N.D. Ill. May 17, 2016); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1333 (W.D. Wash. 2015); *Thorpe v. District of Columbia*, 303 F.R.D. 120, 152 (D.D.C. 2014); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 775 (N.D. Ill. 2014); *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 271-72 (D.N.H. 2013); *Lane v. Kitzhaber*, 283 F.R.D. 587, 602 (D. Or. 2012); *Pashby v. Cansler*, 279 F.R.D. 347, 354 (E.D.N.C. 2011); *Colbert v. Blagojevich*, 2008 WL 4442597, *10 (N.D. Ill. Sept. 29, 2008); *Williams v. Blagojevich*, 2006 WL 3332844, at *5 (N.D. Ill. Nov. 13, 2006); *M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1304 (D. Utah 2003). And in *Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019), an appeal involving the *Thorpe* case, 303 F.R.D. 120, the District of Columbia Circuit found that "this litigation is a proper class action." *Brown*, 928 F.3d at 1079.

This Court's search uncovered only three cases denying class certification for integration mandate claims. *See Donegan v. Norwood*, 2017 WL 6569634, at *11-14, *11 n.10 (N.D. Ill. Dec. 21, 2017) (denying class certification for integration mandate theory of discrimination but granting class certification on different theory); *C.F. v. Lashway*, 2017 WL 2574010, at *4-5 (W.D. Wash. June 14, 2017); *Steimel v. Minott*, 2014 WL 1213390, at *21 (S.D. Ind. Mar. 24, 2014), *aff'd sub nom. Steimel v. Wernert*, 823 F.3d 902, 917-18 (7th Cir. 2016). In addition, the Fifth Circuit reversed a grant of class certification in *A.A. ex rel. P.A. v. Phillips*, 2023 WL 334010, at *3 (5th Cir. Jan. 20, 2023).

This Court's search therefore confirms *Lane*'s observation that courts routinely certify classes in cases alleging violations of the integration mandate. *See* 283 F.R.D. at 595. And as this Court explains later, *see infra* note 11, many of the cases that denied certification are distinguishable.

typicality, and adequacy.  *See* Docket Item 97 at 6.  Nevertheless, this Court begins by addressing the Rule 23(a) requirements and then turns to Rule 23(b).[7]

## I.    RULE 23(a)

### A.    Numerosity

The numerosity requirement is met when the class is "so numerous that joinder of all members in impracticable."  Fed. R. Civ. P. 23(a)(1).  "[N]umerosity is presumed at a level of 40 members."  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  The plaintiffs used state data to estimate that there are 724 Residents and, because each Resident has at least one caregiver, at least 724 Caregivers.  *See* Docket Item 87-1 at 10-12; *see also Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y. 2001) (explaining that courts may make commonsense assumptions when making findings about numerosity).  The state did not address numerosity in its response to the plaintiffs' motion for class certification.  *See generally* Docket Item 92 at 17-26.  Based on the evidence about the Residents and the commonsense assumption that there are at least as many Caregivers as Residents, the plaintiffs have met the numerosity requirement for both proposed subclasses.

### B.    Commonality

A putative class action must present "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "[A] single common question may be sufficient to satisfy this rule."  *Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662, 690 (S.D.N.Y.

---

[7] The Caregivers' claims depend on and largely are coextensive with the Residents' claims, *see* Docket Item 32 at ¶¶ 299, 318, so this Court's Rule 23(a) and (b) analysis for the Caregivers mirrors that of the Residents unless otherwise noted.

1996), *aff'd* 126 F.3d 372 (2d Cir. 1997).  Commonality may exist despite "differences in the individual situations of each named plaintiff."  *Id.* ("Factual differences in the individual claims [] are not fatal.")  In cases like this one, for example, "a wide variation in the nature of [] class members' disabilities" does not preclude a finding of commonality.  *See Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005).  Indeed, commonality can be satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."  *Id.*

As noted above, several courts have found commonality in cases involving integration mandate claims.  For example, in *Lane v. Kitzhaber*, 283 F.R.D. 587, 590-91 (D. Or. 2012), plaintiffs with intellectual or developmental disabilities sued Oregon officials for failing to provide "[s]upported employment services[, which] generally include integration, paid work at or above the minimum wage, individualized services[,] and ongoing supports."  The court found that the plaintiffs met the commonality requirement based on a common question of law: "whether [the] defendants have failed to plan, administer, operate[,] and fund a system that provides employment services that allow persons with disabilities to work in the most integrated setting."  *Id.* at 598.

Although the defendants in *Lane* noted differences among the class members, including that some had declined the opportunity to work in integrated settings and that appropriate vocational training would differ for each member, the court explained that "commonality exists even where class members are not identically situated."  *See id.* at 597-98.  "It is not necessary," the court said, "for plaintiffs to prove at this stage that they and all putative class members are unnecessarily segregated and would benefit from

employment services.  That is, in effect, the *answer* to the common question [of whether they are being denied supported employment services for which they are qualified] and not the common question" itself.  *Id.* at 598 (emphasis added).  The court observed that "[u]nder defendants' interpretation, differences with respect to the needs and preferences of persons with disabilities would always preclude the certification of a class in virtually all ADA Title II cases."  *Id.*

Along the same lines, in *Thorpe v. District of Columbia*, 303 F.R.D. 120, 146-47 (D.D.C. 2014), the plaintiffs, nursing facility residents with physical disabilities, alleged that the District of Columbia's ineffective system for helping them transition to community-based care violated the integration mandate.  As in *Lane*, the court found that the plaintiffs met the commonality requirement.  *Id.*  The court noted that the "plaintiffs' claims raise the following common questions: (1) are there deficiencies in the District's existing system of transition assistance? (2) if so, what are those deficiencies? and (3) are the proven deficiencies causing unnecessary segregation?"  *Id.* at 146.  Regardless of whether those claims are "true or false," the court said, "resolution of these common contentions will generate common answers for the entire class and resolve issues that are central (and potentially dispositive) to the validity of each plaintiff's claim and the claims of the class as a whole."  *Id.* at 146-47 (footnotes omitted).

Likewise, in *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254 (D.N.H. 2013), the court found that plaintiffs challenging compliance with the integration mandate raised common questions of law and fact.  *Id.* at 260, 265-70.  In that case, plaintiffs with serious mental illnesses alleged that New Hampshire officials

violated the integration mandate by using unnecessary institutionalization and thus raised questions about "whether there is a systemic deficiency in the availability of community-based services, and whether that deficiency follows from the State's policies and practices." *Id.* at 260, 267. The court explained that

> [t]hese questions will, necessarily, be answered similarly for every class member. And[] whether the systemic conditions, if shown to exist, expose all class members to a serious risk of unnecessary institutionalization . . . is a central and common contention whose resolution will defeat or advance the claims of all class members, whether institutionalized or not. In short, these common questions can be answered either 'yes' or 'no' for the entire class, and the answers will not vary by individual class member[].

*Id.* at 267 (citation and some internal quotation marks omitted).

Similarly, in *Murphy v. Piper*, 2017 WL 4355970 (D. Minn. Sept. 29, 2017), plaintiffs with disabilities who lived in "Community Residential Setting [] facilities" sued Minnesota officials for, among other things, unduly segregating them and violating the integration mandate. *Id.* at *1, *10. The plaintiffs wanted to access disability waivers to pursue more integrated housing options, and they sought injunctive and declaratory relief to reform the state's administration of the waiver system. *Id.* at *1. In certifying the class, the court found that "[t]he possibility that not all class members would ultimately move out of a [Community Residential Setting]—and even the possibility that a [Community Residential Setting] is in fact the most integrated setting for some individuals—does not defeat commonality." *Id.* at *10. Because the "[p]laintiffs s[ought] to avoid the common injury of unjustified or unnecessary segregation through a system that offers a choice and opportunity to transition to the most integrated setting appropriate to their needs," the court explained, their "alleged injuries [we]re . . . capable of classwide resolution."

13

Here, each of the plaintiffs has been identified by the state as needing a residential placement, and each challenges the defendants' practices, policies, and procedures for administering residential placements. *See* Docket Item 32 at ¶¶ 9, 230, 232, 256; Docket Item 96 at 3 & n.1. As in the cases cited above, common questions include whether there are system-wide deficiencies in supplying CROs and, if so, what types of deficiencies there are and whether they result in unnecessary segregation. *See Thorpe*, 303 F.R.D. at 146-47. "It is not necessary . . . for [the] plaintiffs to prove at this stage that they and all putative class members are unnecessarily segregated and would benefit from [CROs]." *See Lane*, 283 F.R.D. at 598. And contrary to the defendants' arguments, differences among the needs of the class members, and even the possibility that some class members' current placements are more integrated than a CRO, do not preclude commonality. *See Murphy*, 2017 WL 4355970, at *10; *Lane*, 283 F.R.D. at 598.

Moreover, as the plaintiffs emphasize, the state already has found that each class member needs a CRO; in fact, for most of them, the state already has determined the type of placement that would be appropriate based on each member's individual needs. Docket Item 100 at 3-6. And the plaintiffs "do not, for the purpose of this lawsuit, challenge or disagree with the[ state's] determinations." *Id.* at 4. In other words, the defendants' concerns about individualized determinations are exaggerated because many individual determinations already have been made and are uncontested. *See N.B. v. Hamos*, 26 F. Supp. 3d 756, 772 (N.D. Ill. 2014) (holding that commonality was met because the class consisted of children that the state had determined were

eligible for services, so individualized determinations for each class member were not required).

Finally, the defendants raise a defense that also will involve common questions: They say that the plaintiffs seek relief that would "constitute a 'fundamental alteration' to how [they] deliver benefits, services, and programs" to people with disabilities.  Docket Item 56 at ¶ 30.  Although the defendants argue that "[t]his is a fact-specific defense," Docket Item 92 at 23, that argument is based on a misunderstanding about the relief requested.  Contrary to the defendants' suggestion, *see id.*, the plaintiffs do not want to cut the line and jump ahead of those with higher needs.  Rather, the plaintiffs seek a change in the state's planning and policies that would increase the total number of placements.  *See* Docket Item 32 at ¶¶ 9, 256.  Whether doing that would constitute a fundamental alteration is itself a common question.  *See B.D. ex rel. Wellington v. Sununu*, 2024 WL 4227544, at *16 (D.N.H. Sept. 18, 2024) (explaining that affirmative defenses including fundamental alteration may constitute common questions).  So as in *B.D.*, the claims here give rise to common questions, including "whether the challenged practices are, in fact, occurring"; "whether those practices can be reasonably modified"; and "whether instituting the requested modifications would require the state to fundamentally alter its program."  *Id.*

For all those reasons, the plaintiffs satisfy the commonality requirement for both subclasses.

### C.    Typicality

"[T]he claims or defenses of the representative parties [must be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Typicality . . . is satisfied

when each member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability." *Elisa*, 82 F.4th at 128 (citation omitted). "[W]here the claims of a class stem from a single course of conduct, the commonality and typicality requirements of Rule 23(a) tend to merge." *Id.* (citation and internal quotation marks omitted).

Here, each representative plaintiff has sought a CRO placement, has been determined by the state to need such a placement, but has not received the placement because of the challenged policies and procedures. Docket Item 87-2 at ¶¶ 19-22. By definition, the claims of the proposed class members arise from the same policies and procedures. What is more, all claims "stem from a single course of conduct," merging commonality and typicality. *See Elisa*, 82 F.4th at 128. Therefore, and for the same reasons that the plaintiffs satisfy the commonality requirement, they satisfy typicality as well.

The defendants argue that typicality is not satisfied because the claims of the representative plaintiffs are subject to the "fact-specific" fundamental alteration defense. Docket Item 92 at 21-23. But this Court disagrees for the reasons explained in the commonality section. *See supra* Section I.B. Indeed, the fundamental alteration defense raises common questions that tend to bolster, not undermine, the plaintiffs' arguments for class certification.

The plaintiffs therefore satisfy the typicality requirement as well.

### D.    Adequacy of Representation

The final requirement of Rule 23(a) is that the representative parties "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This

requirement "is motivated by concerns similar to those driving the commonality and typicality requirements, namely, the efficiency and fairness of class certification." *Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997).  And it encompasses counsel's qualifications, experience, and ability to conduct the litigation. *Id.*

The defendants "do not challenge the qualifications of [the p]laintiffs' counsel." Docket Item 92 at 24.  Instead, the defendants contend that the class representatives' interests "are antagonistic to the interests of other class members."  *Id.*  More specifically, the defendants argue that some of the representative plaintiffs have less of a need for a CRO, and they say that the system already works "efficiently" for those with higher needs; as an example, they cite the average wait time of four months for a placement for those with "Emergency Need."  *Id.* at 24-26.  Moreover, they say that the class representatives will be incentivized to increase their own types of CRO placements at the expense of other placement types.  *Id.* at 25-26.

This Court disagrees.  First, the defendants' premise about the system working well is open to debate:  It is not evident to this Court that it is "efficient[]" to require a person whose living situation the state has deemed an "emergency" to wait on average one third of a year for a placement.  Second, and even more basically, the defendants again misconstrue the relief that the plaintiffs seek.  The plaintiffs seek systemic relief that would require the state to increase its overall placement opportunities, not relief that would pit those with different placement priorities against each other.  *See* Docket Item 87-1 at 16-17.  Indeed, the plaintiffs posit that the increase could be "in rough proportion

to the [distribution of] placement types that [the state has] already identified."  Docket Item 106 at 7.

Given the plaintiffs' focus on the system's supply of available placements, which would tend to help all members of both subclasses regardless of individual level of need or placement type, this Court finds that the representative parties and their attorneys can "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

## II.    RULE 23(b)

Rule 23(b) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  This rule has been "liberally applied" in cases alleging violations of disability law.  *See Dunn v. Dunn*, 318 F.R.D. 652, 667 (M.D. Ala. 2016) (citation omitted).  "Indeed, some courts have gone so far as to say that the rule's requirements are 'almost automatically satisfied in actions primarily seeking injunctive relief.'"  *See id.* (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994)).  So generally, when plaintiffs allege systemic problems and request systemic remedies, they meet the requirements of Rule 23(b)(2).  *See Dunn*, 318 F.R.D. at 668; *see also N.B.*, 26 F. Supp. 3d at 774 ("By their very nature [] policy changes [related to the integration mandate] are generally applicable, and therefore would benefit all class members."); *Brown v. District of Columbia*, 928 F.3d 1070, 1082 (D.C. Cir. 2019) ("If a certain outcome is legally mandated and an injunction provides each member of the class an increased opportunity to achieve that outcome, Rule 23(b)(2) is satisfied.").

Courts in integration mandate cases, including those in the cases discussed in Section I.B. above, have found that the plaintiffs satisfied Rule 23(b)(2).  *See Lane*, 283 F.R.D. at 600-02; *Thorpe*, 303 F.R.D. at 151-52; *Kenneth*, 293 F.R.D. at 270-71; *Murphy*, 2017 WL 4355970, at *14-15.  For example, in *Thorpe*, the case involving the District of Columbia's alleged failure to provide effective community transition assistance, the court noted that "[f]or purposes of satisfying Rule 23(b)(2), it is sufficient that [the] plaintiffs have proffered evidence of systemic deficiencies in the District's system of transition assistance and that those deficiencies appear to be affecting the class."  303 F.R.D. at 151.  Similarly, in *Murphy*, the case involving waivers for more integrated residential settings, the court explained that "[the p]laintiffs do not seek individualized injunctive relief for each class member.  Rather, [they] seek final relief that would enable them to access individualized housing services and integrated residential settings through improvements to [the d]efendant's administration of the . . . [w]aivers."  2017 WL 4355970, at *15.  In both cases, the courts found that the plaintiffs satisfied Rule 23(b) for the reasons stated.

Here, the plaintiffs seek similar declaratory and injunctive relief.  For example, they seek "a declaration that [the d]efendants are violating their obligations under the ADA and the Rehabilitation Act to provide and administer services in the most integrated appropriate setting possible."  Docket Item 32 at 36.  Likewise, they seek "an order directing [the d]efendants to remedy such unlawful conditions by providing sufficient appropriate supported community residential placements to [the p]laintiffs . . . [and] to prepare a plan of correction with input from the [p]laintiff class for court

approval."  *Id.*  And for the same reasons the plaintiffs in the cited cases satisfied Rule 23(b), the plaintiffs here do as well.

The R&R recommended finding that the plaintiffs did not satisfy Rule 23(b)(2) because the type of placement that would be "appropriate" for each member is an individualized determination.  Docket Item 97 at 6-9.  The R&R analogized the case at bar to *Shook v. Board of County Commissioners*, 543 F.3d 597 (10th Cir. 2008), where the Tenth Circuit affirmed a district court's order denying class certification.  Docket Item 97 at 8-9.  And the R&R concluded that as in *Shook*, the plaintiffs requested an injunction at too high a level of abstraction.  *Id.* at 9.

As noted above, however, the type of placement that would be "appropriate" for each member is not what the plaintiffs contest and does not factor into the relief they seek.  To be sure, the plaintiffs say that they have been denied "a system that would have the effect of ensuring" that they receive appropriate residential placements.  *See Dunn*, 318 F.R.D. at 663; Docket Item 87-1 at 18.  But they say that the denial stems from grounds that apply generally to the class and policies that result in too few CROs.  Docket Item 87-1 at 19; Docket Item 100 at 6.  And the plaintiffs request injunctive relief in the form of additional available CROs, a generally applicable policy change that would affect the class as a whole.[8]  *See* Docket Item 32 at 36.

In other words, as in *Murphy*, the plaintiffs "do not seek individualized injunctive relief for each class member."  *See* 2017 WL 4355970, at *15; Docket Item 93 at 3;

---

[8] The fact that some class members "[may] not have been injured by the challenged polices . . . does not defeat certification" as long as "the challenged conduct or lack of conduct [is] premised on a ground that [applies] to the entire class."  *Dunn*, 318 F.R.D. at 668 n.14 (citations omitted).

Docket Item 100 at 5-7.  Instead, the relief they seek "focuses on [the] defendants'

conduct, not on the treatment needs of each class member."  *See Lane*, 283 F.R.D. at

602.  And for that reason, they have satisfied Rule 23(b)(2).

The nuanced standard for analyzing requests for injunctive relief in *Shook* does

not lead to a different result.[9]  Among other requirements, Federal Rule of Civil

Procedure 65(d) mandates that an order granting an injunction include specific terms

detailing the act or acts restrained or required.  *Shook* explained that "[a]t the class

certification stage, the injunctive relief sought must be described in reasonably particular

detail such that the court can at least conceive of an injunction that would satisfy Rule

65(d)'s requirements."  *Shook*, 543 F.3d at 605 (citation and internal quotation marks

omitted).  Further,

> the degree of specificity with which plaintiffs must describe the injunctive
> relief requested becomes more exacting as the litigation progresses: the

---

[9] The merits analysis in *Shook* has limited import because that case involved reviewing the denial of class certification under a deferential standard.  The court specifically noted that "we very well may have made a different decision had the issue been presented to us as an initial matter, and while other district courts perhaps could have chosen, or could choose, to certify similar classes, we cannot say the district court's assessment was beyond the pale."  *Shook*, 543 F.3d at 603-04; *see also id.* at 600 ("[W]e might reach a different conclusion were we addressing the certification question in the first instance, [but] we are unable to say that the district court abused its discretion in declining to certify the proposed class").  So even under facts quite similar—indeed, identical—to those in *Shook*, a district court could certify a class.

What is more, the injunctive relief requested in *Shook* differed starkly from the relief requested in this case.  The plaintiffs in *Shook* sought several injunctions related to jail conditions.  *Id.* at 604-05.  Some of the requests sought relief that "would require the district court to craft an injunction that distinguishes—based on individual characteristics and circumstances—*between* how prison officials may treat class members, rather than prescribing a standard of conduct applicable to *all* class members."  *Id.* at 605.  Furthermore, the plaintiffs "eschewed any effort to give content" to some of their requests.  *Id.* at 606.  That is nothing like the plaintiffs' straightforward request for relief generally increasing the availability of CROs here.

complaint need only be specific enough to satisfy our notice pleading standards; the class certification motion must be more specific, sufficient to allow the district court to see how it might satisfy Rule 65(d)'s constraints and thus conform with Rule 23(b)(2)'s requirement; and the motion for relief or proposed injunction must of course itself be specific enough to comport with Rule 65(d).[10]

*Id.* at 605 n.4.

The defendants complain that the request for injunctive relief is too general to satisfy Rule 65(d) because it does not say "(1) how [the state] would establish more CROs (require [the state] to operate more state-operated community residential placements, increase CRO reimbursement rates to encourage private operators to develop more CRO opportunities, etc.); or (2) the type of CROs [the state] need[s] to establish." *See* Docket Item 105 at 3-4. But this Court can "conceive" of specific injunctions that would increase the number of CROs, *see Shook*, 543 F.3d at 605, including through the alternatives that the state itself listed—for example, by simply ordering the state to operate more placements. *See Fitzmorris v. N.H. Dep't of Health & Hum. Servs. Comm'r Weaver*, 2023 WL 8188770, at *27 (D.N.H. Nov. 27, 2023) ("[T]he court could calculate the approximate number of additional service providers needed to meet the aggregate needs of the class and order the defendants to formulate and institute a plan to retain that number of service providers"). And the plaintiffs have offered content about the type and quantity of CROs that they want the state to establish by pointing to the state's own identification of the appropriate placement type

---

[10] The R&R cites two cases addressing the Rule 65(d) standard for injunctions. Docket Item 97 at 9 n.3 (citing *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011), and *Bone v. Univ. of N.C. Heath Care Sys.*, 678 F. Supp. 3d 660 (M.D.N.C. 2023)). But those cases applied the higher standard of meeting Rule 65(d), not the lower standard that applies at the class certification stage. *See Mickalis*, 645 F.3d at 143-46; *Bone*, 678 F. Supp. 3d at 686, 708-10.

for most Residents.  *See* Docket Item 106 at 7 ("In order to meet the demand, [the state] would need to open a greater number of community placements, presumably in rough proportion to the [distribution of] placement types that [the state has] already identified."); *cf. Shook*, 543 F.3d at 605-06.  So at this stage, the request for relief meets the *Shook* standard because this Court can "conceive of an injunction that would satisfy" Rule 65(d).  *See Shook*, 543 F.3d at 605 (citation omitted).

The defendants' other arguments are equally unavailing.  *See* Docket Item 92 at 23-24; Docket Item 105 at 2-5.  The defendants emphasize difficulties in connection with placing individuals, but those difficulties do not address the plaintiffs' point that there are systemic issues capable of systemic fixes.  In fact, the defendants' briefing suggests that there is a systemic deficiency in the availability of CROs.  *See* Docket Item 105 at 3 (explaining that "there are limited placements for individuals with developmental disabilities"); *see also* Docket Item 92-1 at ¶ 53 (explaining that approximately 1,147 people had "unmet need[s]" as of December 2022).  That may be because the limited available resources preclude that remedy—an issue for another day.  But for now, that evidence of systemic deficiencies supports certification under Rule 23(b)(2).  *See Thorpe*, 303 F.R.D. at 151.

The defendants also note that there are vacancies in some placements, and they say that issues such as staffing shortages prevent them from operating at full capacity.  Docket Item 92 at 22; Docket Item 92-1 at ¶ 68.  But that simply provides one reason why there are not enough available CROs; it does not suggest that the requested

injunctive relief could not increase the number of available CROs and therefore help solve the problem.[11]

In sum, because the plaintiffs have satisfied the Rule 23(a) requirements and at least one of the Rule 23(b) requirements, class certification is appropriate.[12]

## CONCLUSION

The motion for certification of a class pursuant to Rule 23(b)(2), Docket Item 87, is GRANTED. The two subclasses shall include those who meet the criteria set forth in

---

[11] The defendants cite *Kent-Chojnicki v. Runyon*, 180 F.R.D. 237 (W.D.N.Y. 1998), to argue that this case requires too many individualized determinations and therefore is not suited for class relief. *See* Docket Item 105 at 5. In *Kent-Chojnicki*, the court denied class certification to employees of the U.S. Postal Service because their claims involved individualized determinations about whether they were discriminated against. 180 F.R.D. at 242-43. For example, the plaintiffs alleged that after they suffered injuries, they were given "Rehabilitation Job Offers" that were unworkable for various reasons, such as because the jobs were "outside their doctor[s'] prescribed limitations." *Id.* But *Kent-Chojnicki* is inapposite both because the plaintiffs here request relief based on the state's policies and because many of the individualized determinations already have been made. While the job offers in *Kent-Chojnicki* are analogous to the placement types here, the plaintiffs challenged the job offers based on individualized factors in *Kent-Chojnicki*, while the plaintiffs here explicitly do not challenge the state's individual designations.

And the integration mandate cases denying class certification, *supra* note 6, do not change this Court's analysis. *Donegan*, for example, is distinguishable, at least in part, because it involved plaintiffs who did not allege systemic failures. *See Donegan*, 2017 WL 6569634, at *11 & n.10. Further, two of the other cases involved class definitions that were "too vague," *Steimel v. Wernert*, 823 F.3d at 917, or inadequately defined, *A.A.*, 2023 WL 334010, at *3. But the defendants do not contend that the class definitions in this case are vague. *See also Steimel v. Wernert*, 823 F.3d at 917 (noting "serious reservations" about the district's court's determination that the plaintiffs failed all of Rule 23's criteria).

[12] The plaintiffs argue that Rule 23(b)(3) applies as well, *see* Docket Item 87-1 at 19-20, but this Court does not address that alternate basis because the plaintiffs are entitled to class certification by satisfying just one of the Rule 23(b) requirements.

the plaintiffs' proposed class definition.  The Court appoints Bruce A. Goldstein and Alexander J. Douglas as class counsel under Federal Rule of Civil Procedure 23(c)(1)(B) and 23(g).

The case is referred back to Judge McCarthy for further proceedings consistent with the referral order of April 3, 2023, Docket Item 86.

SO ORDERED.

Dated:   November 20, 2024
             Buffalo, New York


  _/s/ Lawrence J. Vilardo_
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE